[No. H011285. Sixth Dist. Aug. 4, 1994.]

WDT-WINCHESTER, Plaintiff and Respondent, v.
ELEANOR NILSSON, Defendant and Appellant.

## COUNSEL

Myers, Hawley, Morley, Myers & McDonnell and John P. McDonnell for Defendant and Appellant.

Germino, Runte, Amaral, Jordan, Carpenter & Mackay, John O. Germino and Susan R. F. Solomon for Plaintiff and Respondent.

## OPINION

**ELIA, J.**—Defendant lessee Eleanor Nilsson appeals from a judgment in unlawful detainer in favor of plaintiff lessor WDT-Winchester (WDT). On appeal, Nilsson makes the following claims: (1) the trial court abused its discretion when it denied her request for relief from jury trial waiver; (2) the trial court erred in relying upon Code of Civil Procedure[1] section 1161.1 as that provision was not applicable to these proceedings; (3) assuming arguendo that section 1161.1 was applicable, the court relied upon an erroneous interpretation of the statute as well as faulty calculations of the amount owed under the terms of the lease in determining that WDT had reasonably estimated the amount stated in its three-day notice. We find the last contention to be meritorious and therefore reverse the judgment.

### Facts

In April 1992, the parties executed a lease by which Nilsson became the lessee of a commercial building owned by WDT, a California limited partnership. Nilsson leased the building for the purpose of operating a retail business. The lease was for a period of five years at an initial base monthly rental of $12,616. Stuart Adams, vice-president of Huettig and Schromm, handled the lease negotiations on behalf of WDT; the lease itself was signed by Howard White, a general partner of WDT.

Paragraph 8 of the lease related to the payment of taxes and assessments and provided in relevant part: "All property taxes or assessments levied or

---

[1]All unspecified section references are to the Code of Civil Procedure.

assessed or hereafter levied or assessed by any governmental authority against the Premises or any portion of such taxes or assessments which becomes due or accrued during the term of this Lease shall be paid by Lessor. Lessee shall reimburse Lessor for Lessee's proportionate share of such taxes or assessments within ten (10) days of receipt of Lessor's invoice demanding such payment. Lessee's liability hereunder shall be prorated to reflect the commencement and termination dates of this Lease."

At the time the lease was executed, the building was in a "shell condition," consisting of concrete walls and floors. The agreement contained two provisions relating to tenant improvements. Paragraph 7 provided in relevant part: "Lessor will, at its sole expense, make improvements to the Premises as specified in Exhibit 'B' attached hereto and by this reference made a part hereof." Paragraph 7 of the addendum read: "Lessor shall provide Lessee with an $18.00 per square foot [allowance] for mutually agreeable tenant improvements. . . . [¶] For each dollar over or under the $18.00 allowance the rent shall be adjusted up or down to the rental rate of $.015/dollar/square foot of improvements; i.e. if the tenant improvement allowance comes in at $16.00 per square foot, the rent, as referred to above, would decrease by $.03/square foot/month."

The parties reached an agreement on a blueprint for tenant improvements on or about August 21, 1992. The blueprint was then submitted to the architect with authorization to proceed on final drawings for submission to the City of Campbell. By letter dated September 14, 1992, Richard D. Thompson, a general partner of WDT, notified Nilsson that the plan had been submitted to the City of Campbell. Attached to the letter was a budget which categorized the construction expenses of $279,391, and indicated a construction cost of approximately $21 per square foot, some $3 over the $18 allowance provided by the lease. According to the lease, the overage was to be amortized over the term of the lease and added to the base rent as per paragraph 7 of the addendum, set forth above. The construction budget noted expenses of approximately $25,000 for "overhead/profit." This latter figure represented a profit fee of 10 percent over and above the project cost which WDT had agreed to pay to the firm of Huettig and Schromm Construction Company for its role as general contractor. Thompson was vice-president of Huettig and Schromm, a company which was owned by WDT general partner Howard White. Huettig and Schromm had a contract with WDT to act as general contractor for construction of the tenant improvements of the subject property. Thompson testified that a 10 percent profit payment to the general contractor is a common and standard practice in the industry and is considered to be an element of the cost of tenant improvements.

The lease provided that the payment of rent was to commence upon the date that WDT tendered possession of the premises upon completion of the construction of tenant improvements. This occurred on October 28, 1992, when the fire department "gave preliminary occupancy," and Thompson notified Nilsson that the building was ready to be occupied. According to Thompson, only "minor level, punch-list-type activities" remained to be completed as of October 28. Nilsson, on the other hand, claimed the building was not ready for occupation and complained of major ongoing construction. Nilsson took possession on November 2, 1992.

Meanwhile, by invoice dated October 12, 1992, WDT had billed Nilsson $10,702.50 for what was claimed to be her proportionate share of property taxes and assessments for the period between October 15, 1992, to June 30, 1993. The county's tax bill, which covered the fiscal year of July 1, 1992, to June 30, 1993, showed that WDT owed annual taxes and assessments in the amount of $69,794.88. The first installment of $34,897.44 was due November 1, 1992, with a delinquency date of December 10, 1992. The second installment, for the same amount, was due on February 1, 1993, with a delinquency date of April 10, 1993.

On November 20, 1992, WDT served Nilsson with a three-day notice to "correct default" or quit the premises, which included notification of landlord's election to forfeit the lease. The notice alleged that Nilsson was in default of the lease for nonpayment of $26,475.46 in rent, operating expenses, insurance, property taxes, and late charges.

On December 4, 1992, Thompson signed and personally served on Nilsson a second three-day notice to pay rent or quit. As had the initial notice, the subsequent notice stated that the lessor had elected to declare the lease forfeited. Cited in the notice as reasons for this action were Nilsson's nonpayment of $40,493.75 in rent, property insurance, property taxes, and late charges. The notice indicated that the total figure demanded was a "reasonable estimate" of the amount owing under the lease. Having received no response on the notice to quit, plaintiff brought a complaint in unlawful detainer on December 8, 1992.

At trial, Thompson explained that the December 4 notice was calculated upon a rent of $13,216.60. This figure included the base rent of $12,616 specified in the lease, plus $597.60 for the improvements in excess of the $18 per square foot allowance. Both notices also demanded property taxes of $10,165.30 for the period of October 28, 1992, through June 30, 1993. This

latter figure was based upon the following calculation: WDT divided the total tax bill by 365, the number of days in the year, for a per diem tax of $191.22. Figuring that Nilsson would be in possession of the premises for 246 days of fiscal 1992, WDT multiplied the per diem tax by a factor of 246. Since Nilsson occupied 13,280 square feet of the building, or approximately 22 percent of the total square footage of the premises, the latter factor was then multiplied by 22 percent. Utilizing this calculation, WDT determined that Nilsson owed $10,165.30 in property taxes.[2]

It was established at trial that WDT issued a check in the amount of $34,897.44, dated November 25, 1992, for the first property tax installment. At time of trial, WDT had not yet received its cancelled check for the property tax payment and presented only a photostatic duplicate of a non-negotiable copy of the November 25 check. Thompson did not know when the check had been mailed, but testified that WDT accountants normally mail such payments "around the first of December." Although the normal payment schedule sometimes "slip[ped] depending on the accounting process," Thompson indicated that the payments were generally paid close to the due date and were always in before the delinquency date.

WDT did not introduce any evidence showing its payment of the second tax installment, and Thompson testified that he had no evidence of such payment. Thompson also testified that to the best of his knowledge, WDT had not paid any portion of the property taxes as of October 12, 1992, the date on which WDT had forwarded an invoice demanding payment of property taxes. Thompson admitted that as of October 12, WDT had not yet tendered possession of the premises to Nilsson. However, it was the general practice of WDT to bill for property taxes prior to the payment date so that it would have the money in hand to pay the outstanding taxes. Thompson testified that the underlying lease conformed with this tax billing policy.

After trial to the court, judgment was rendered in favor of plaintiff. In its statement of decision, the court found possession of the premises was tendered on October 28, 1992. Although the court affirmed the sums claimed by WDT for rent, late charges, and property insurance, it found that Nilsson owed only half of the $10,165 claimed for property taxes and deducted the overage ($5,082) from the taxes demanded in the notice. Taking into account this deduction, the court concluded that the actual amount owed at the time

---

[2]Using these same factors, we have arrived at a figure of $10,348.83. We calculated as follows: $69,794.88 divided by 365 equals $191.22; $191.22 multiplied by 246 equals $47,040.12; $47,040.12 multiplied by 22 percent equals $10,348.83.

of the December 4 notice was $35,411.10. Although the amount claimed in the notice ($40,493.75) was incorrect, the court found that it was reasonably estimated under section 1161.1.[3] The court further held, by a preponderance of the evidence, that Nilsson was aware of and agreed to tenant improvements at a cost of approximately $21 per square foot, including the charge for profit and overhead. The cost of improvements was also found to be reasonable.

Thereafter, Nilsson filed motions for new trial and to vacate or amend the judgment. Among other things, these motions were premised upon the contention that the court had incorrectly computed the taxes due on the subject property. Nilsson argued that no taxes were owing at the time of the three-day notice. Assuming arguendo that some taxes were owed, Nilsson pointed out that her lease was in effect for only 65 days during the first half of fiscal year 1992, from October 28 through December 31, 1992. She therefore argued that the amount of taxes attributable to the first installment was only some $2,700, as opposed to the $5,082 figure arrived at by the court. If this amount were incorporated into the court's calculations, it would mean that Nilsson owed approximately $33,000 at the time the notice was issued rather than the $40,493.75 claimed by WDT, a differential of more than 20 percent. In denying the motion, the court indicated that even if Nilsson's tax computations were correct, it would still have found WDT's notice to have been reasonably calculated under section 1161.1. Although the final judgment was amended to include an award of attorney fees to WDT, the judgment did not adopt Nilsson's tax computations, instead implicitly relying upon the court's initial finding that Nilsson owed one-half of the amount claimed by WDT for property taxes.

---

[3]Section 1161.1 provides in relevant part: "With respect to application of Section 1161 in cases of possession of commercial real property after default in the payment of rent: [¶] (a) If the amount stated in the notice provided to the tenant pursuant to subdivision (2) of Section 1161 is clearly identified by the notice as an estimate and the amount claimed is not in fact correct, but it is determined upon the trial or other judicial determination that rent was owing, and the amount claimed in the notice was reasonably estimated, the tenant shall be subject to judgment for possession and the actual amount of rent and other sums found to be due. However, if (1) upon receipt of such a notice claiming an amount identified by the notice as an estimate, the tenant tenders to the landlord within the time for payment required by the notice, the amount which the tenant has reasonably estimated to be due and (2) if at trial it is determined that the amount of rent then due was the amount tendered by the tenant or a lesser amount, the tenant shall be deemed the prevailing party for all purposes. If the court determines that the amount so tendered by the tenant was less than the amount due, but was reasonably estimated, the tenant shall retain the right to possession if the tenant pays to the landlord within five days of the effective date of the judgment (1) the amount previously tendered if it had not been previously accepted, (2) the difference between the amount tendered and the amount determined by the court to be due, and (3) any other sums as ordered by the court. . . ."

## Discussion

In order for a lease to be forfeited at common law, the landlord was required to have first made a demand for the precise sum of rent due. (*Gage v. Bates* (1870) 40 Cal. 384.) The common law rule was retained when the original Unlawful Detainer Act was adopted in 1863 and remained the law through numerous amendments. (*Ibid.*; accord, *Baugh v. Consumers Associates Ltd.* (1966) 241 Cal.App.2d 672, 674-675 [50 Cal.Rptr. 822]; *Canal-Randolph Anaheim, Inc.* v. *Wilkoski* (1978) 78 Cal.App.3d 477, 488 [144 Cal.Rptr. 474].) With the enactment of section 1161.1 in 1990, however, the Legislature effected a liberalization of the common law rule in the context of commercial leases. Under this provision, a landlord of commercial real property may prevail in an unlawful detainer action even if the demand for rent is incorrect. In order to invoke section 1161.1, however, the amount stated in the notice must be clearly identified as an estimate. If there is a subsequent judicial determination that rent was in fact owed and that the amount claimed was reasonably estimated, the landlord may prevail. (§ 1161.1.)

■ It has long been recognized that the unlawful detainer statutes are to be strictly construed and that relief not statutorily authorized may not be given due to the summary nature of the proceedings. (*Superior Motels, Inc.* v. *Rinn Motor Hotels, Inc.* (1987) 195 Cal.App.3d 1032, 1070 [241 Cal.Rptr. 487].) The statutory requirements in such proceedings " 'must be followed strictly, otherwise a landlord's remedy is an ordinary suit for breach of contract with all the delays that remedy normally involves and without restitution of the demised property.' [Citation.]" (*Id.* at p. 1071.) Thus, a commercial landlord who invokes the summary procedures of unlawful detainer must strictly comply with the notice requirements of the statute under which he/she elects to proceed. (Cf. *Kwok v. Bergren* (1982) 130 Cal.App.3d 596, 599-600 [181 Cal.Rptr. 795].)

## I. *The Operative Notice*

■ Nilsson contends that the operative notice in this case was provided on November 20, 1992. That notice did not identify the rent claimed as an estimate and thus did not invoke section 1161.1. Nilsson argues that the initial notice served to terminate the leasehold and thus contends that WDT must be held to the stricter requirements of section 1161, which mandate a demand for the precise sum due. This contention is not cognizable on appeal.

Our review of the record establishes that there was no serious attempt to raise this theory below.[4] " 'As a general rule an appellate court will consider only such points as were raised in the trial court, and this rule precludes a party from asserting, on appeal, claims to relief not asserted or asked for in the court below. . . .' [Citation.]" (*Cislaw* v. *Southland Corp.* (1992) 4 Cal.App.4th 1284, 1297 [6 Cal.Rptr.2d 386].) Such is the case here. Thus, as did the parties and the court below, we deem the operative notice to be that provided on December 4, 1992.

## II. *Whether the December 4 Notice Complies With Section 1161.1*

Nilsson asserts that the rent demanded in the December 4 notice was not reasonably estimated as required by section 1161.1. In so arguing, Nilsson challenges the trial court's calculations of the amount owed on several grounds, including the court's finding that the lease term commenced on October 28, 1992, its interpretation of the lease agreement as permitting a profit to the general contractor for the construction of tenant improvements, and the court's determination of the property taxes due.

### A. *The Commencement of the Lease*

■ Nilsson challenges the sufficiency of the evidence supporting the court's determination that the lease term commenced on October 28, 1992, when WDT tendered possession of the premises upon substantial completion of the construction of the tenant improvements.

In reviewing a challenge to the sufficiency of the evidence, we resolve all conflicts in support of the trial court's judgment. The appellate court is bound by the trial court's determination of the facts except to the extent that they are not supported by substantial evidence. (*Gooch* v. *Hendrix* (1993) 5 Cal.4th 266, 278 [19 Cal.Rptr.2d 712, 851 P.2d 1321].)

Here, the lease agreement called for the commencement of the payment of rent once construction of the tenant improvements was completed and tendered possession of the subject premises. As noted in our factual summary, the record contains conflicting evidence concerning the readiness of

---

[4]At the hearing on the motion for new trial, Nilsson's attorney argued that reliance on section 1161.1 would be "a bit unfair . . . because of the two three-day notices that were given to [Nilsson], one of which did not mention Section 1161.1 and the second one which came about two weeks later which did, and I think that served to confuse [Nilsson] in this case, and she really did not have an effective opportunity to analyze the statute and make a decision about tendering the undisputed amount . . . ." However, Nilsson never argued, as she does on appeal, that the second notice was a nullity because the leasehold had been terminated by the first notice.

the premises, with Thompson testifying the building was approved and ready for occupancy and Nilsson making the opposite claim. We will not second-guess the trial court's resolution of these factual issues. The record contains substantial evidence—that is, evidence which is " 'reasonable in nature, credible, and of solid value' " (*Braewood Convalescent Hospital* v. *Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 159, 164 [193 Cal.Rptr. 157, 666 P.2d 14])—in support of the trial court's determination.

## B. *The Profit Margin*

We next consider Nilsson's contention that the trial court erred in interpreting the tenant improvements clause specified in paragraph 7 of the addendum as including a 10 percent profit fee to the general contractor. This appears to present a question of first impression.

There is no mention in the lease of any such charge. Paragraph 7 of the addendum merely states that WDT will provide Nilsson with an allowance of $18 per square foot "for mutually agreeable tenant improvements." Neither the lease nor the addendum contains a definition of the term "tenant improvements." However, Thompson testified that a 10 percent fee charged in this case is common and standard in the industry and further attested that such fees are generally accepted as an element of the cost of tenant improvements.

"The interpretation of a written instrument is essentially a judicial function to be exercised according to the generally accepted canons of interpretation." (*Estate of Lindstrom* (1987) 191 Cal.App.3d 375, 382, fn. 7 [236 Cal.Rptr. 376].) It is also the rule that where extrinsic evidence was offered or received as an aid of interpretation the appellate court will review the interpretation of the agreement under the substantial evidence rule. (See *Signal Companies, Inc.* v. *Harbor Ins. Co.* (1980) 27 Cal.3d 359, 375 [165 Cal.Rptr. 799, 612 P.2d 889, 19 A.L.R.4th 75]; *Edmond's of Fresno* v. *MacDonald Group, Ltd.* (1985) 171 Cal.App.3d 598, 603 [217 Cal.Rptr. 375].)

"The paramount rule governing the interpretation of contracts is to give effect to the mutual intention of the parties. That intent must, in the first instance, be derived from the language of the contract—we must look to the words themselves. . . . The language, if clear, explicit, and if it does not invoke an absurdity, controls our interpretation. [Citations.]" (27 Cal.3d at p. 375; Civ. Code, § 1638.) It is equally settled that "[t]he words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical

sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." (Civ. Code, § 1644.) ■ A lease should also be interpreted so as to make it reasonable, if this can be accomplished without violating the intent of the parties. (Civ. Code, § 1640.) ■ The evidence adduced below, considered in light of these principles, supports the trial court's conclusion that the actual cost of the tenant improvements was intended to include the contractor's profit.

It is uncontroverted—and common sense tells us—that the construction of tenant improvements on real property necessarily requires the expenditure of funds to pay for the cost of such improvements. ■ Indeed, the word "improvement," in its ordinary and common usage, connotes "a permanent addition to or betterment of real property that enhances its capital value *and that involves the expenditure of labor or money* and is designed to make the property more useful or valuable as distinguished from ordinary repairs." (Webster's New Internat. Dict. (3d ed. 1981) p. 1138, italics added.)

■ Profit margins are incorporated into the sale of virtually every commercial product or service on the market. Were we to accept Nilsson's interpretation of the underlying lease agreement, we would be constrained to read out of the cost of tenant improvements any profit margin, thus requiring the landlord to bear the entire expense of the general contractor's fee. Such an interpretation would violate the rule requiring us to construe the lease so as to make it reasonable. (Civ. Code, § 1640.) In sum, we are satisfied that the evidence supports the trial court's interpretation of the lease as including a fair profit margin to the general contractor as an element of the cost of tenant improvements.

C. *Property Taxes*

■ Nilsson contends that the notice to pay rent or quit was incorrect in claiming any property taxes because no such taxes were owed under the lease agreement as of December 4. WDT contends that substantial evidence supports the trial court's determination that the first installment of taxes was properly included as rent due under the three-day notice. Based upon the above cited principles of interpretation, we find Nilsson's contention to be meritorious.

The lease itself, which was drafted by WDT, calls for WDT to pay any property taxes accrued during the term of the lease, and requires Nilsson to "reimburse" WDT for her proportionate share of property taxes within 10 days of receipt of an invoice demanding such payment. ■ The word "reimburse," in its ordinary acceptation, signifies the following: "to pay

back (an equivalent for something taken, lost, or expended) to someone," to "repay," "to make restoration," to "indemnify." (Webster's New Internat. Dict., *supra*, p. 1914.)

 In addition to the lease, the court was presented with extrinsic evidence concerning the meaning of paragraph 8 in the form of Thompson's testimony that the lease agreement was written to conform with WDT's general policy of advance billing for property taxes. However, WDT offered no evidence explaining the basis for this assumption. The record demonstrates that Thompson was not involved in the lease negotiations between Nilsson and WDT, and did not sign the lease. Although Thompson signed and served the December 4 notice, it is not at all clear whether he had read the lease himself or merely had been advised of its contents. Indeed, it appears that the demand for $10,165.30 in property taxes in the three-day notice was most likely attributable to WDT's general billing practice. We find this evidence insufficient to support the trial court's implicit conclusion that the lease agreement was intended to permit advance billing.

The language of paragraph 8 is clear and explicit and compels the conclusion that WDT was obligated to *first* pay the property taxes and *then* seek reimbursement from Nilsson. Nilsson was then obligated to repay WDT for her share of the assessed taxes within 10 days of receiving an invoice demanding such payment.

The facts of record, however, contain absolutely no evidence establishing WDT's payment of any of the taxes owed. At trial, WDT presented only a nonnegotiable, unsigned, uncancelled copy of a check dated November 25, 1992, for payment of only the first installment. Thompson had no knowledge of when or if this check had been mailed and could only testify to WDT's custom and habit of paying the tax bill in early December. Thus, under the terms of the lease drafted by WDT, the claim for reimbursement was completely premature.

Even if we assume, for purposes of argument, that WDT tendered payment of the taxes attributable to the first installment on or about December 1, as was its customary practice, there was no evidence of payment of the second installment. Thus, WDT could have billed Nilsson on December 1 only for her share of taxes attributable to the first installment. Even under this theory, however, Nilsson would not have been in default of the property tax provision under the lease until 10 days after receipt of WDT's invoice. It follows that the December 4 notice was incorrect insofar as it made *any* demand for the payment of real property taxes. The notice to pay rent or quit therefore exceeded the amount actually due by some $10,165.

WDT's reliance upon *Schulman* v. *Vera* (1980) 108 Cal.App.3d 552 [166 Cal.Rptr. 620], and *Reed* v. *South Shore Foods, Inc.* (1964) 229 Cal.App.2d 705 [40 Cal.Rptr. 575], is misplaced. Contrary to the facts of record, the lease in *Schulman* failed to specify the time for payment of property taxes. In addition, evidence at trial established that the lessees knew of their obligation to pay the tax bill. (108 Cal.App.3d at pp. 555, 563.) In *Reed*, the reviewing court rejected lessee's assertion that the three-day notice was insufficient because the notice demanded taxes not in fact due on the ground that the lessee's answer admitted the nonpayment of taxes. Nilsson's answer made no such admission.

### D. *Whether the Amount Claimed in the Notice Was Reasonably Estimated*

Subdivision (e) of section 1161.1 creates a rebuttable presumption that a demand by a landlord is "reasonably estimated" if there is a judicial determination that the amount claimed did not exceed the actual amount due by more than 20 percent.[5]

Here, we have determined that the December 4 notice for $40,493.75 exceeded the amount actually owed by $10,165.30, a differential of approximately 25 percent. Since the margin of error exceeded the 20 percent figure contemplated by subdivision (e), no presumption could have arisen in this case.

However, this does not end our inquiry. As the trial court observed, a demand which exceeds the 20 percent margin set forth in subdivision (e) may nevertheless be deemed a reasonable estimate under subdivision (a), depending upon the facts of the case. The circumstances of record, however, do not justify such a finding in this instance.

As noted above, the record contains no adequate explanation for WDT's inclusion of $10,165.30 in property taxes contrary to the provisions of the lease WDT had itself prepared. (See pt. II.C.) Given these facts, we find the record lacks substantial evidence to establish that the notice to pay rent or quit was reasonably estimated under section 1161.1.

---

[5]Subdivision (e) states: "(e) For the purposes of this section, there is a presumption affecting the burden of proof that the amount of rent claimed or tendered is reasonably estimated if, in relation to the amount determined to be due upon the trial or other judicial determination of that issue, the amount claimed or tendered was no more than 20 percent more or less than the amount determined to be due. However, if the rent due is contingent upon information primarily within the knowledge of the one party to the lease and that information has not been furnished to, or has not accurately been furnished to, the other party, the court shall consider that fact in determining the reasonableness of the amount of rent claimed or tendered pursuant to subdivision (a)."

### III. *Tenant's Failure to Tender Rent*

Section 1161.1, subdivision (a) contains a provision permitting the tenant to reasonably estimate and tender the amount of rent due. This portion of the statute reads: "However, *if* (1) upon receipt of such a notice claiming an amount identified by the notice as an estimate, the tenant tenders to the landlord within the time for payment required by the notice, the amount which the tenant has reasonably estimated to be due and (2) if at trial it is determined that the amount of rent then due was the amount tendered by the tenant or a lesser amount, the tenant shall be deemed the prevailing party for all purposes. If the court determines that the amount so tendered by the tenant was less than the amount due, but was reasonably estimated, the tenant shall retain the right to possession if the tenant pays to the landlord within five days of the effective date of the judgment (1) the amount previously tendered if it had not been previously accepted, (2) the difference between the amount tendered and the amount determined by the court to be due, and (3) any other sums as ordered by the court." (Italics added.)

At the hearing on Nilsson's motion for a new trial, the trial court made various comments indicating that it had construed this particular provision as imposing a mandatory duty upon the tenant to make a tender of the amount the tenant has reasonably estimated to be due.[6] The court appears to have concluded that absent such a tender, the landlord will prevail irrespective of the reasonableness of the landlord's estimate. In its brief, WDT

---

[6]The court stated, for example, that it is "dangerous" for a tenant to ignore the notice completely, as had Nilsson, opining that such a position "would really operate to her detriment." Under the new statute, "[w]hat you must do is you determine what you think is reasonable, what you might owe and pay it in. Tender it. Then a couple [of] things happen. [¶] If you are right and the Court finds that your estimate is right, you are the prevailing party. Okay. But if you are wrong, and the Court tells you you are wrong after the evidence is before the Court, you still have an option to stay in by paying the difference. . . . And it says what is reasonable under the circumstances is determined by the Court after the trial of the issues. . . . [¶] The Defendant in this case did nothing, and so for her to come in and complain now that the statute is, one, not fair or she didn't get notice because of some previous three-day notice, I don't think that that excuses her from the adherence to the statute."

At a later stage of the hearing, the court reasoned: "I think the important part of the statute is the first part of the statute where he gives the tenant the responsibility and the right to say, 'You disagree with this, Mrs. Tenant. Pay what you think you owe, what your estimate is as you calculate it.' "

At another point in the hearing, the following colloquy occurred:

"THE COURT: You need to go back to the basic lease without calculating any improvements or taxes or any of the other costs. Even if you go back and say, 'Okay, I owe something, at least I know I owe rent. I'll pay my basic rent and then we will argue about the rest of the stuff in court. And if I'm wrong, fine, the judge will tell me what the difference is, I'll pay it in and still remain in possession.' That is what she didn't do. That's where we are.

"[DEFENSE COUNSEL]: I agree she didn't do that, Your Honor. I feel that—

"THE COURT: But what you are arguing, counsel, is she was excused from that performance because of this one confusion on the . . . three-day notice thing, and two, that she didn't have

urges us to uphold the judgment by applying the trial court's construction of the statute. However, neither the language of section 1161.1 nor its legislative history supports such an interpretation.

"[O]ur first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose . . . ." (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

The legislative history of section 1161.1 indicates that the purpose of subdivision (a), which contains provisions liberalizing the landlord's notice requirements and protecting the tenant's right to possession where the tenant tenders a reasonable estimate of the sum estimated due, is to "avoid multiple litigation in cases where the amount of rent due is uncertain." (Sen. Com. on Judiciary Rep. (May 22, 1990) (1989-1990 Reg. Sess.) p. 2.) The bill was also intended to "clarify and make uniform the rules applicable to commercial tenancies . . . in order to reduce and expedite litigation, to conserve the time and resources of the courts and the parties, and to reduce costs." (Sen. Rules Com. Rep. (Aug. 22, 1990) p. 3.)

Examining the statute in light of these criteria, we note the absence of any mandatory terminology. The tenant is not commanded to make a tender in order to preserve his/her right to possession. Rather, section 1161.1 uses conditional phraseology when speaking of a tender by the tenant. In addition, section 1161.1 does not contain any language which can be reasonably construed as reading out of the statute the obligation of the landlord to make a reasonable estimate of the rent owing. Finally, we can think of no rational basis why such a construction would further the purpose of the statute, i.e., to avoid multiple litigation where the amount of rent due is uncertain. In

---

ample time to study the second three-day notice to make a judgment as to what she wanted to do. I gave you my views on that already."

Subsequently, while discussing the statute's provision for the tender of rent by the tenant, the court remarked: "It seems to me to mean that the tenant has to reasonably act within a very short period of time. . . . [¶] I think the statute and the legislature puts the burden on the tenants to do that, to [do] that very thing, to pay attention to notices coming in. It carved out a difference between domestic tenants and commercial tenants. And I think the dispute is between you and the legislature. So I don't know what else we can do."

sum, there is nothing in the language of section 1161.1 which supports the interpretation arrived at by the court and urged by WDT. Accordingly, we conclude that while the tenant may act to protect his/her right to possession by tendering a reasonable estimate of the rent due, the failure to do so does not relieve the landlord of complying with the obligation to provide a notice which reasonably estimates the amount owed.

The legislative history of section 1161.1 lends further support to our construction. As originally proposed (Sen. Bill No. 2498 (1989-1990 Reg. Sess.) as introduced Feb. 28, 1990), section 1161.1, subdivision (a) provided that the tenant's right to possession would be forfeited if upon trial the court determined a significant amount of rent was owing, unless (1) the tenant had offered and tendered the amount he/she believed due within the time specified by the notice to pay rent or quit, and (2) at trial, it was determined that the amount of rent due was equal to or less than that tendered by the tenant.[7] This provision was subsequently replaced by the present language.

■ The Legislature's omission of a provision from the final version of a statute which was included in an earlier version "constitutes strong evidence that the act as adopted should not be construed to incorporate the original provision. [Citation.]" (*Central Delta Water Agency* v. *State Water Resources Control Bd.* (1993) 17 Cal.App.4th 621, 634 [21 Cal.Rptr.2d 453].) ■ Had the Legislature intended to make the tender of rent by the tenant a mandatory obligation, the absence of which would defeat the tenant's right to judgment and possession, it would have retained the original language; its failure to do so is strong evidence against WDT's construction of section 1161.1.

For the foregoing reasons, we hold that the December 4 notice failed to comply with the requirements set forth in section 1161.1 in that the amount of rent claimed was not reasonably estimated. Since the notice was defective, it is insufficient to support the judgment for unlawful detainer. (Cf. *Kwok* v. *Bergren*, *supra*, 130 Cal.App.3d 596, 599-600.) In view of our determination, it is unnecessary to reach Nilsson's remaining contention.

---

[7]As originally introduced, Senate Bill No. 2498 read in pertinent part: "With respect to possession of commercial real property after default in the payment of rent: [¶] (a) If the *amount stated in the notice provided to the tenant pursuant to subdivision (2) of Section 1161* is incorrect, but upon trial the court determines that a significant amount of rent was owing, the tenant shall be subject to judgment for possession and the actual amount of rent and other sums found to be due. However, if (1) upon receipt of the notice, the tenant offers and tenders to the landlord within the time for payment required by the notice, the amount which the *tenant believes to be due and (2) if at trial it is determined that the amount of rent then due was the amount tendered by the tenant or a lesser amount, the tenant shall be deemed the prevailing party for all purposes. . . .*"

*Disposition*

The judgment is reversed and the trial court is directed to enter a judgment in favor of Nilsson. Costs on appeal are awarded to appellant.

Cottle, P. J., and Bamattre-Manoukian, J., concurred.