[Nos. D023202, D023426. Fourth Dist., Div. One. Aug. 29, 1997.]

FEDERAL NATIONAL MORTGAGE ASSOCIATION, Plaintiff and Respondent, v.
RANDOLPH C. BUGNA, Defendant and Appellant.

**COUNSEL**

Hovey, Kirby, Thornton & Hahn and Dean T. Kirby, Jr., for Defendant and Appellant.

Robert E. Weiss and Edward A. Treder for Plaintiff and Respondent.

## OPINION

**McDONALD, J.**—Secured creditor Federal National Mortgage Association (FNMA) claims it is entitled to certain rents from an apartment building pursuant to an "assignment of rents" clause in a trust deed encumbering the apartments. Borrower Randolph C. Bugna (Bugna) contends that FNMA was required by the trust deed to make a postdefault written demand for the rents, and that FNMA's failure to make the demand bars FNMA from claiming the rents collected prior to a demand. FNMA contends that no demand was necessary and that the steps it took were adequate to entitle it to the rents. Bugna appeals the trial court's ruling awarding the rents to FNMA.

I

FACTS

A. *The Loan*

In 1986 Bugna borrowed $5,315,000, executed a note for the loan, and executed a trust deed encumbering an apartment building (the apartments) as security for the note. The provisions of paragraph 26 of the trust deed, assigning to lender the rents from the apartments, are critical to this dispute. Paragraph 26 provided in part:

"As part of the consideration for the indebtedness evidenced by the Note, Borrower hereby absolutely and unconditionally assigns and transfers to Lender all the rents and revenues of the Property, including those now due, past due, or to become due . . . . Borrower hereby authorizes Lender or Lender's agents to collect the aforesaid rents and revenues and hereby directs each tenant of the Property to pay such rents to Lender or Lender's agents; provided, however, that prior to written notice given by Lender to Borrower of the breach by Borrower of any covenant or agreement of Borrower in this instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower, to apply the rents and revenues so collected to the sums secured by this Instrument in the order provided in paragraph 3 hereof with the balance, so long as no such breach has occurred, to the account of Borrower, it being intended by Borrower and Lender that this assignment of rents constitutes an absolute assignment and not an assignment for additional security only. Upon delivery of written notice by Lender to Borrower of the breach by Borrower of any covenant or agreement of Borrower in this Instrument, and without the necessity of Lender entering upon and taking and maintaining full control of the Property in person, by agent or by a court-appointed

receiver, Lender shall immediately be entitled to possession of all rents and revenues of the Property as specified in this paragraph 26 as the same become due and payable, including but not limited to rents then due and unpaid, and all such rents shall immediately upon delivery of such notice be held by Borrower as trustee for the benefit of Lender only; provided, however, that the written notice by Lender to Borrower of the breach by Borrower shall contain a statement that Lender exercises its rights to such rents. Borrower agrees that commencing upon delivery of such written notice of Borrower's breach by Lender to Borrower, each tenant of the Property shall make such rents payable and pay such rents to Lender or Lender's agents on Lender's written demand to each tenant therefor . . . .

". . . . . . . . . . . . . . . . . . . . . . . . .

"All rents and revenues collected subsequent to delivery of written notice by Lender to Borrower of the breach by Borrower of any covenant or agreement of Borrower in this Instrument shall be applied first to the costs, if any, of taking control of and managing the Property and collecting the rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, costs of repairs to the Property, premiums on insurance policies, taxes, assessments and other charges on the Property, and the costs of discharging any obligation or liability of Borrower as lessor or landlord of the Property and then to the sums secured by this Instrument. . . ."

B. *The Bankruptcy Proceedings*

In mid-1987 Bugna conveyed various properties, including the apartments, to his wife, Mary Bugna (Mary). In 1988 some of Bugna's creditors filed an involuntary chapter 7 bankruptcy proceeding against Bugna. In June 1989 the bankruptcy trustee (the trustee) filed a complaint to void Bugna's prepetition transfers of properties to Mary. On December 1, 1992, a judgment was entered nullifying Bugna's transfer of the apartments to Mary. This judgment had the effect of voiding the transfer and revesting title in Bugna, and the apartments became an asset of the bankruptcy estate. The trustee then took possession of the apartments and began collecting the rents.

C. *The Default and the Preempted Receivership*

Default on the note occurred on October 1, 1992, when the installment due on that date was not paid. On December 3, 1992, FNMA sent a demand letter (the demand) to Bugna and Mary stating FNMA was exercising its rights to the rents from the apartments. The following day, FNMA filed a complaint in the state court for judicial foreclosure and gave telephonic

notice to Mary that it would seek appointment of a receiver to assume control of the apartments. On December 7, 1992, a receiver was appointed to take over the apartments.

FNMA was unaware of the December 1, 1992, judgment voiding Bugna's transfer of the apartments to Mary at the time of FNMA's demand and judicial action filing. Upon learning of the judgment, FNMA concluded the bankruptcy "automatic stay" (11 U.S.C. § 362) barred its action to obtain possession of the apartments. FNMA therefore suspended pursuit of the state court action. FNMA contacted the trustee and reasserted FNMA's claim of a security interest in the rents and demanded that all rents collected by the trustee be sequestered for FNMA's benefit. FNMA then dismissed its state court action without prejudice.

## D. *Abandonment of the Apartments*

The trustee took possession of the apartments and rents on December 1, 1992. By September 1993, however, the trustee determined that sale of the apartments would not yield significant equity to the bankruptcy estate; he therefore sought an order permitting him to abandon both the apartments and the net rents the trustee collected during his tenure. On November 15, 1993, the bankruptcy court entered an order authorizing the trustee to abandon the apartments and all net rents collected by the trustee.

## E. *The Disputed Orders*

A state court receiver (the receiver) was appointed at FNMA's request in November 1993 and obtained control of the apartments. The receiver began collecting rents in November 1993.[1] In December 1993 the trustee transferred to the receiver more than $337,000 in net rents collected by the trustee.

FNMA nonjudicially foreclosed on the apartments in March 1994. The credit bid by FNMA was approximately $1.3 million less than the amount owed on the note.

---

[1]On October 6, 1993, FNMA obtained relief from the automatic stay to permit FNMA to pursue its state court remedies. On October 26, 1993, FNMA filed the present action seeking judicial foreclosure and the appointment of a receiver. On October 28, 1993, FNMA sought and obtained an ex parte order appointing a receiver for the apartments and setting a November 8, 1993, hearing for confirmation of the appointment. However, the confirmation hearing was taken off calendar for lack of proof of service, and the receivership was terminated as of November 15. FNMA thereafter obtained an order reappointing the receiver nunc pro tunc to November 8, 1993. Bugna does not challenge the propriety of the nunc pro tunc appointment or FNMA's right to rents collected by the receiver during his tenure; he challenges FNMA's entitlement to rents collected prior to November 8, 1993.

FNMA then moved for an order directing the receiver to remit to FNMA all rents and revenues he received from the apartments, including the amounts received from the trustee. The receiver moved for an order authorizing him to disburse to FNMA the funds collected and to wind up the receivership. Bugna opposed both motions. The court granted FNMA's motion in its entirety and granted the receiver's motion subject to filing a final accounting.

## II

### CONTENTIONS ON APPEAL

Bugna contends the trial court erred by ordering disbursement to FNMA of the rents collected by the trustee. ▮▮▮ Bugna argues that under the terms of the trust deed FNMA is entitled to rents collected only after FNMA has made a valid written demand notifying the borrower it is exercising its right to rents, and that because no valid demand was made prior to November 1993 the rents collected prior to that time should not have been released to FNMA. FNMA responds that no written demand is necessary because on default it is automatically entitled to all postdefault rents without the necessity of a written demand.

We conclude that although FNMA had a perfected security interest in the rents, the trust deed required an additional step—making a written demand exercising its rights—to enforce that security interest; therefore FNMA is entitled only to those rents collected after the demand was made.[2]

---

[2] FNMA's position that no demand is necessary made it unnecessary to litigate whether *its actions prior to November 1993 satisfied the "demand" requirement.* For example, the parties did not litigate whether FNMA's December 3, 1992, demand was sent at a time when record title to the property was vested outside the bankruptcy estate, and if so, whether an otherwise valid notice to a nonbankrupt owner of record is retroactively voided by a *subsequently recorded judgment restoring the property to a bankruptcy estate.* Second, assuming the December 3 demand did violate the automatic stay, the parties did not litigate whether the demand was void or merely voidable. (Compare *In re Siciliano* (3d Cir. 1994) 13 F.3d 748, 751 and *Easley* v. *Pettibone Michigan Corp.* (6th Cir. 1993) 990 F.2d 905, 911 [actions voidable] with *In re Schwartz* (9th Cir. 1992) 954 F.2d 569, 571-573 [actions void].) Moreover, even if the demand were a "void" action, some courts have recognized a limited power to validate the act through granting retroactive relief from the automatic stay. (See, e.g., *Franklin Sav. Ass'n* v. *Office of Thrift Supervision* (10th Cir. 1994) 31 F.3d 1020, 1023.) Third, there is authority holding that actions taken in violation of the automatic stay are not necessarily void when the bankruptcy is later dismissed (see, e.g., *Shell Oil Co.* v. *Capital Financial Services* (Bankr. S.D. Tex. 1994) 170 B.R. 903, 906), and the parties have not litigated whether abandonment of the apartments might have the effect of a dismissal of the bankruptcy as to that property. Finally, the parties did not litigate the effect, if any, of FNMA's demand on the trustee to sequester rents. (See *In re Foxhill Place Associates*

## III

### ANALYSIS

*A.   The Trust Deed Provides FNMA Is Entitled to Rents Collected After It Has Made Written Demand Notifying the Borrower of Its Exercise of Its Rights to Rents*

Paragraph 26 of the trust deed is unclear as to the date after which FNMA becomes entitled to accrued but unpaid rents. Under familiar rules of contract interpretation we construe an instrument as a whole and give effect to every provision (Civ. Code, § 1641).[3] When ambiguities exist they are construed against the drafter of the instrument. (*Cathay Bank* v. *Lee* (1993) 14 Cal.App.4th 1533, 1541 [18 Cal.Rptr.2d 420].) We resolve any ambiguities against FNMA because paragraph 26 of the trust deed is a provision in a standardized contract drafted and selected by the lender. (*Tahoe National Bank* v. *Phillips* (1971) 4 Cal.3d 11, 20 [92 Cal.Rptr. 704, 480 P.2d 320].)

Our review of paragraph 26 as a whole convinces us written notice of default and demand for rents is the event defining the date FNMA becomes entitled to the rents. Paragraph 26 refers to delivery of "written notice" on several occasions and states that "prior to delivery of written notice" borrower may collect and receive the rents. It then provides that "[u]pon delivery of written notice" FNMA becomes entitled to "possession of all rents and revenues . . . as the same become due and payable, including but not limited to rents then due and unpaid, and all such rents shall immediately upon delivery of such notice be held by Borrower as trustee for the benefit of Lender only." This language does not provide that rents collected *before* notice is given (i.e., rents no longer due and unpaid) are held by borrower for FNMA. Finally, the trust deed contains instructions on how rents "collected subsequent to delivery of written notice" shall be applied, but is silent on how rents collected prior to that notice should be applied, strengthening the interpretation that rents collected prior to the notice are not due FNMA.

FNMA argues that because the assignment is absolute and unconditional, Bugna had a mere conditional right to retain the rents which automatically terminated when Bugna defaulted on the note, and that the only function of the written notice and demand was to terminate Bugna's right to collect the rents. FNMA points to the following language in paragraph 26: ". . . [P]rior to written notice given by Lender to Borrower of the breach by Borrower of

---

(Bankr. W.D. Mo. 1990) 119 B.R. 708.) We express no opinion on the effect, if any, these issues might have on remand.

[3]All further statutory references are to the Civil Code unless otherwise specified.

any covenant or agreement of Borrower in this instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower, to apply the rents and revenues so collected to the sums secured by this Instrument in the order provided in paragraph 3 hereof *with the balance, so long as no breach has occurred, to the account of Borrower . . . ."* (Italics added.)

FNMA relies on this language to argue that rents collected by Bugna prior to a default were collected in trust for the benefit of FNMA and Bugna and rents collected after default were collected in trust solely for the benefit of FNMA. FNMA's argument that upon default Bugna becomes trustee for the benefit of FNMA automatically and without notice appears inconsistent with the express clause describing the time at which Bugna becomes trustee for FNMA's exclusive benefit: *"Upon delivery of written notice* by Lender to Borrower of the breach . . . , Lender shall immediately be entitled to possession of all rents . . . *as the same become due and payable*, including but not limited to rents then due and unpaid, and *all such rents shall immediately upon delivery of such notice be held by Borrower as trustee for the benefit of Lender only*; provided, however, that the written notice by Lender to Borrower of the breach by Borrower shall contain a statement that Lender exercises its rights to such rents." (Italics added.)

The express language of paragraph 26 states that *upon notice* FNMA is entitled to "due and payable" rents and that "such rents," which do not include previously collected rents, shall be held by Bugna as trustee for FNMA "[u]pon delivery of written notice."

FNMA's interpretation effectively eliminates the need to give the written notice described in numerous places within paragraph 26. Indeed, one of the clauses requiring notice specifies the notice "shall contain a statement that Lender exercises its rights to such rents." FNMA's interpretation that it is entitled to all rents even without any affirmative action to assert its rights appears inconsistent with the requirement that a lender affirmatively exercise its rights to rents in its written notice.[4]

FNMA seeks to buttress its interpretation by citing *In re Scottsdale Medical Pavilion* (9th Cir. 1995) 52 F.3d 244 (adopting the opinion of *In re Scottsdale Medical Pavilion* (B.A.P. 9th Cir. 1993) 159 B.R. 295) as holding that a debtor's right to retain rents can automatically terminate on default even though the debtor might be entitled to continue collecting rents after

---

[4]Moreover, if the obligation arises automatically, Bugna could presumably be liable for damages (despite antideficiency laws) if he used postdefault rents ignorant of either the default or FNMA's intent to exercise its right to the rents.

default. *Scottsdale* considered the narrow issue of whether postdefault rents were "cash collateral" within the meaning of 11 United States Code section 363(a). In *Scottsdale,* the security agreement provided that all postdefault rents collected by the debtor, including those collected before the creditor acted to enforce its security interest, were subject to the creditor's security interest; therefore the court decided all postdefault rents were "cash collateral" in the bankruptcy estate under 11 United States Code section 363(a). (159 B.R. at pp. 300-301.) However, *Scottsdale* was decided under Arizona law, and FNMA makes no effort to persuade us that Arizona law is similar to California law. More importantly, *Scottsdale* evaluated the intent of the parties based on the language of the security agreement, and the opinion does not state whether the security agreement in *Scottsdale* contained clauses similar to the "written notice" language contained in paragraph 26 of the trust deed here.[5] We therefore cannot determine whether the security agreement in *Scottsdale* was ambiguous as to whether only post-notice rents belonged to the creditor.

We are persuaded by the holding of *In re Goco Realty Fund I* (Bankr. N.D. Cal. 1993) 151 B.R. 241 (hereafter *Goco*), in which the court applied California law to a trust deed containing "absolute assignment/notice" provisions similar to paragraph 26 in this case. *Goco* noted that former section 2938, subdivision (b), applicable to this transaction (§ 2938, subd. (i)), provided that a security agreement which used language creating an absolute assignment of rents conditional upon default was effective to confer on the lender a perfected security interest despite " 'any provision . . . that would otherwise preclude or defer enforcement of the rights granted the assignee . . . .' " (151 B.R. at p. 247.) Referring to the quoted statutory language, *Goco* stated: "The literal words of the statute plainly anticipate an enforcement step by a lender who holds legal title to rents arising from a perfected conditional absolute assignment of rents before the lender is entitled to possession. . . . However, the language of the statute leaves ambiguous the question of entitlement to rents after perfection but before enforcement of the assignment." (*Ibid.*)

*Goco* concluded "perfection" protects the security interest against an intervening third party, but that an additional "enforcement" step is required under California law to allow the creditor to begin collecting the assigned rents, and the borrower is entitled to the rents collected before the enforcement step is taken. The *Goco* court, citing numerous California cases and secondary sources, stated:

---

[5]In *Scottsdale*, the "absolute" assignment clause (par. 3.7) contained no language concerning notice from the creditor. The only clause which *did* discuss notice (par. 2.6) merely authorized lessees to pay creditor directly upon notice although debtor could collect rents until notice was given. (159 B.R. at pp. 300-301.)

". . . California law holds that even when an assignment is absolute, an affirmative enforcement step in addition to perfection is a prerequisite to the lender's possession of the rents, and that the lender is entitled to all the rents, issues, and profits from the time of demand upon the defaulting borrower to deliver possession and pay over the rents. [Citations.] In each of the cases cited, the issue was whether the lender or the borrower was entitled to the rents that accrued after the borrower's default. These authorities make clear that upon default, enforcement brings an inchoate interest to fruition and the lender acquires priority in rents arising only after enforcement. . . .

"No California court has interpreted an absolute assignment of rents to be self-executing with respect to enforcement upon default by the borrower. Thus, a lender's right to possession of rents arises only upon both the borrower's default and the lender's demand for possession. Although [section 2938] may obviate the need for a further perfection step, it cannot be read to obviate the need for a further enforcement step." (151 B.R. at p. 248.)

The commentators appear in accord with our conclusion that under California law as it existed prior to the 1996 amendments to section 2938,[6] an absolute assignment permits a creditor to collect all rents accruing *after* but not before a creditor has made demand for those rents. For example, Witkin states that "[w]hile [*Kinnison v. Guaranty Liquidating Corp.* (1941) 18 Cal.2d 256 [115 P.2d 450]] indicates that an absolute assignment operates to transfer the right to rents to the mortgagee upon the 'happening of the specified event,' i.e., upon *default*, the courts have held that the mortgagee is entitled to the rents only from the date of his *demand*." (3 Witkin, Summary of Cal. Law (9th ed. 1987) Security Transactions in Real Property, § 88, p. 594, original italics; accord, Miller & Starr, Current Law of California Real Estate (2d ed. 1989) Deeds of Trust and Mortgages, § 9:46, p. 125 ["When the assignment is absolute, the beneficiary is entitled to all the rents, issues, and profits from the time he makes demand . . . ."].)

We therefore interpret the language of the trust deed as providing that the date on which written notice and demand or some other form of "enforcement step" was taken defines the date after which FNMA was entitled to the rents.

---

[6]The 1996 amendments to section 2938 were designed to avoid the confusion which plagued the courts in this area by providing: (1) the assignment is a present assignment regardless of the language used to create it (subd. (a)); (2) the assignment is fully perfected when properly recorded (subd. (b)); and (3) upon default the creditor could collect rents which accrued but were unpaid and uncollected "[o]n and after the date the assignee takes one or more of the enforcement steps" described in subdivision (c), such as making demand for the rents on the borrower (subd. (c)(4)). Thus, the new statute clearly provides that a creditor holding an absolute assignment is not entitled to rents collected prior to the date it takes one of the enforcement steps. (See Williams et al., *Assignment of Rents—The Next Generation* (Winter 1997) 15 Cal. Real Prop. J. 27, 33-34.)

## B. *Former Section 2938 Does Not Obviate the Necessity for an Enforcement Step*

In 1991 the Legislature enacted former section 2938. (Stats. 1991, ch. 501, § 1, p. 2445.) FNMA argues the legislative purpose of this enactment was to obviate the need for lenders holding an absolute assignment conditional on default to take any further steps as a condition to the lenders' right to post-default rents. Section 2938 was designed to strengthen a lender's position against a bankruptcy trustee by conferring "perfected" status to liens created by an "absolute assignment conditional on default" clause. (See generally, O'Neill, *Assignment of Rents: Mystery or Enigma?* (Winter 1992) 10 Cal. Real Prop. J. 20, 21.) However, a statutory grant of perfection against third party lien creditor claims does not necessarily eliminate the requirement for additional enforcement steps to be taken to terminate the debtor's rights to the rents. We are convinced, based on the legislative history of the statute, that section 2938 was not intended to eliminate the need for additional enforcement steps.[7] Former section 2938, as originally proposed to the Legislature, contained the following language: "Notwithstanding the fact that an assignee may be required to enforce its perfected interest in the rents by notice or through the appointment of a receiver . . . , the assignor who has granted an assignment of rents . . . shall collect the rents, issues and profits that are the subject of the assignment as agent for the assignee, and the assignee's interest in the rents, issues, and profits shall continue in the rents, issues, and profits collected by the assignor . . . ." (Sen. Bill No. 326 (1991-1992 Reg. Sess.) as introduced Feb. 11, 1991.)

The foregoing language parallels FNMA's argument that notwithstanding any requirement of notice or demand, the borrower collects the rents as agent for the lender, and the lender's interest in those funds continues as to funds collected by the borrower prior to notice. However, the proposed language was criticized by a committee staff report: "Case law holds that the mortgagee is entitled to rents only from the date of his demand. (See Witkin, Summary of California Law, 9th Ed. (1987) 'Secured Transactions in Real

---

[7]FNMA claims the commentators have construed section 2938 as being designed to eliminate the need to take any postdefault enforcement steps, such as a demand or appointment of a receiver, to enforce its rights to postdefault rents. However, one of the commentators cited by FNMA states: "It would have been helpful if [section] 2938 had expressly provided that taking possession through appointment of a receiver or some equivalent action is not a prerequisite to enforcing an absolute assignment. As written, [section] 2938 may perpetuate the long-standing question of whether such actions are necessary, even when a creditor has an absolute assignment." (Reynolds, *A New Look at Secured Creditors' Rights to Rents and Profits: Is the Pendulum Swinging Back?* (Cont.Ed.Bar 1992) 15 Real Prop. L. Rep. 257, 262.)

Thus, even the commentators on which FNMA relies agree that former section 2938 did not expressly eliminate the need for postdefault enforcement steps.

Property,' Sec. 88, page 594.) Thus, case law does not allow the creditor to automatically claim rents as far back as the date of default. This provision would do so. This added ability of the lender to reach more funds would mean less funds for the debtor and the unsecured creditors. [¶] WOULD NOT THIS PROVISION ESTABLISH AN UNEQUAL PLAYING FIELD FAVORING LENDERS?" (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 326 (1991-1992 Reg. Sess.) Apr. 9, 1991, p. 4.)

The proposed statutory language quoted above was thereafter deleted from Senate Bill No. 326. (See Sen. Amend. to Sen. Bill No. 326 (1991-1992 Reg. Sess.) Apr. 23, 1991.) ■ The deletion of that clause confirms our interpretation that section 2938 was not intended to permit enforcement as to rents collected prior to notice, because "[t]he Legislature's omission of a provision from the final version of a statute which was included in an earlier version 'constitutes strong evidence that the act as adopted should not be construed to incorporate the original provision. [Citation.]' " (*WDT-Winchester* v. *Nilsson* (1994) 27 Cal.App.4th 516, 534 [32 Cal.Rptr.2d 511], quoting *Central Delta Water Agency* v. *State Water Resources Control Bd.* (1993) 17 Cal.App.4th 621, 634 [21 Cal.Rptr.2d 453].)

FNMA cites *MDFC Loan Corp.* v. *Greenbrier Plaza Partners* (1994) 21 Cal.App.4th 1045 [26 Cal.Rptr.2d 596] as holding that former section 2938 eliminates the need for the lender to take steps beyond recordation of the trust deed to be entitled to enforce its interests in postdefault rents. In *MDFC Loan Corp.*, the borrower executed a trust deed containing a rent assignment clause absolutely assigning the rents conditional on default. After default, the lender obtained the appointment of a receiver, and the following day the borrower declared bankruptcy. (21 Cal.App.4th at p. 1048.) The issue was whether the lender was entitled to the rents collected *after the receiver was appointed*. (*Id.* at p. 1050.) *MDFC Loan Corp.* determined only that the lender was entitled to rents collected after default and after the enforcement step of appointment of a receiver had been taken. (*Id.* at p. 1052.) *MDFC Loan Corp.* distinguished *Goco, supra,* 151 B.R. 241 precisely on the grounds that, unlike the creditor in *Goco,* the creditor in *MDFC Loan Corp.* had taken an enforcement step and there was no claim in *MDFC Loan Corp.* that the creditor had failed timely to demand the rents from the property. (21 Cal.App.4th at p. 1052.) Thus, *MDFC Loan Corp.* did not hold former section 2938 dispensed with the necessity of an enforcement step, but instead ruled the creditor was entitled to rents collected after the enforcement step had been taken.

■ We conclude the enactment of section 2938 did not alter existing California law requiring that a lender holding a perfected security interest in

rents must take some form of an enforcement step to terminate the borrower's right to postdefault rents.

## DISPOSITION

The judgment is reversed. The order directing the receiver to remit the funds to FNMA and the order authorizing the receiver to disburse the funds to FNMA and to wind up the receivership are reversed. Bugna is entitled to costs on appeal.

Work, Acting P. J., and Sharp, J.,* concurred.

A petition for a rehearing was denied September 23, 1997, and respondent's petition for review by the Supreme Court was denied November 25, 1997. Kennard, J., Baxter, J. and Chin, J., were of the opinion that the petition should be granted.

---

*Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.