**In re Ricardo E. BROWN, Jr. p/k/a Kurupt, Debtor.**

**Ricardo E. BROWN, Jr. p/k/a Kurupt, Plaintiff,**

**v.**

**DEATH ROW RECORDS, INC., Suge Music, and Interscope Records, Defendants.**

**Bankruptcy No. 97–16006DAS. Adversary No. 97–1033DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 2, 1998.

Order Denying Reconsideration April 28, 1998.

Edmond George, Obermayer, Rebmann, Maxwell & Hippel, LLP, Philadelphia, PA, for Debtor.

David L. Braverman, Fellheimer, Eichen, Braverman & Kaskey, Philadelphia, PA, for Death Row Records, Inc. and Suge Music.

Toby Marie Daluz, Reed Smit Shaw & McClay, Philadelphia, PA, for Sharitha Knight.

James L. Allison, Philadelphia, PA, for Interscope Records.

David E. Kenner, Encino, CA, for Defendants.

Richard L. Sherman, Beverly Hills, CA, for Lamont & Kenneth Brumfield.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA, for U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The instant proceeding ("the Proceeding") is in essence a counterclaim to proofs of claim filed by Defendants DEATH ROW RECORDS, INC. ("DRR") and SUGE MUSIC ("SM;" with DRR, "the Defendants") in connection with, respectively, a recording contract and a publishing contract entered into between RICARDO E. BROWN, JR. ("the Debtor"), a recording artist, and the Defendants, by which the Debtor seeks to recover unpaid royalties. In light of ambiguities in the contracts, all of which we must construe against the Defendants, as drafters of adhesion contracts; gaps in recordkeeping which even eminently-qualified experts could not totally resolve; and the lack of meaningful assistance from the parties' post-trial submissions on issues important to quantify damages, our conclusions are somewhat tentative.

We find the evidence presented by the Debtor's experts, Ira Herzog and Seymour Straus, to be far more reliable than that of the Defendants, sole fact witness, accounting consultant Eric Wasserman. Therefore, we accept the Herzog/Straus figures as a starting point. However, because their account of recording royalties includes a pre-contract recording and soundtracks for which the Debtor has probably already received fixed compensation, we will reduce his recording royalty claim from the $660,181.77 proffered by Herzog/Straus to $319,701.74. Further, because their accounting of publishing royalties appears to include a component which was not yet received by SM, and therefore is not yet due and payable under unambiguous contract terms, we will reduce his publishing royalty claim from $704,980.77 to $273,564.76. While our uncertainties do not warrant our declining to enter any judgment, the inconclusive evidence regarding the publishing royalties motivates us to add a caveat that this award is without prejudice to either party to modify our figure if more definitive evidence comes to light.

### B. PROCEDURAL AND FACTUAL HISTORY

The Debtor is a "gangsta rap" artist professionally known as "Kurupt the Kingpin" or simply "Kurupt" who, with another individual professionally known as "Dis Nigga Daz" ("Daz"), formed "Tha Dogg Pound," initially a backup group for a very successful rap artist, Calvin Broadus, professionally known as Snoop Doggy Dogg ("Snoop"), but ultimately a successful artist in its own right. The Debtor filed the underlying individual voluntary Chapter 11 bankruptcy case on May 14, 1997. Two days later, on May 16,

1997, he revealed the impetus for this bankruptcy by filing an omnibus motion seeking to reject contracts relating to recording, songwriting, and career management with Lamont Brumfield ("Lamont") and Kenneth Brumfield ("Kenneth;" with Lamont, "the Brumfields"), dated November 30, 1991, and the contracts at issue with DRR and SM, dated January 1, 1993. The goal of the Debtor was to terminate these contracts in order that he could enter into more lucrative ones with other recording and publishing businesses, especially since the Defendants' organization, such as it ever was, had crumbled subsequent to the incarceration of its principal, Marion "Suge" Knight, on weapons charges in 1996.

In a previous decision of July 23, 1997, reported at 211 B.R. 183 along with a similar decision in the case of singer Rachelle B. Ferrell ("*Brown I*"), we held that, while the Debtor was entitled to reject all of the foregoing contracts, the effect of rejection was not necessarily an automatic termination of these contracts and his release from their anti-competition provisions. *Id.* at 188, 189–91. Nevertheless, in an Order of September 3, 1997, we granted the Debtor's motion to approve his execution of new recording, publishing, and management contracts with different parties. Thereafter, on November 26, 1997, the District Court, per the Honorable Harvey Bartle III, in a decision reported at 1997 WL 786994 ("*Brown II*"), finished the job by reversing *Brown I* insofar as we refrained from declaring the non-competition clauses in the contracts unenforceable. We note that the Defendants have appealed *Brown II* to the Third Circuit Court of Appeals.

The instant Proceeding was filed on October 2, 1997, while *Brown I* was as yet undecided on appeal to the District Court. It includes one Count, since apparently voluntarily abandoned and therefore dismissed in our accompanying order, in which an accounting of the Debtor's recording royalties was sought from Interscope Records, a party unrelated to the Defendants. It also includes nine Counts each against DRR and SM seeking the following: (1) accountings of the proceeds from sales of his works; (2) turnover of royalties allegedly due; (3) damages under 11 U.S.C. § 362(h) for failure to provide the aforementioned accountings and turnover; (4), (5), (6), and (7), avoidance of the contracts on four separate legal theories; and (8) and (9), termination of the contracts on two state law theories. It would appear that, unless *Brown II* is reversed, that decision resolved the last six Counts favorably to the Debtor. The only issue which the parties pursued before us was the Debtor's rights to accountings and royalties.

The trial of the Proceeding was originally scheduled on November 19, 1997. An Answer of both Defendants including Counterclaims seeking, *inter alia*, compensatory damages from the Debtor in the nature of recovery of unrecouped advances, was filed by the Defendants on November 10, 1997. DRR and SM also filed unsecured proofs of claim in the amounts of $1.4 million and $10,000, respectively, in this case on the November 21, 1997, bar date.

The trial was continued to January 7, 1998, and the court allowed a further continuance to February 18, 1998, only on the condition that the trial was then listed on a must-be-tried basis. We were reluctant to allow any further continuances because we were concerned that the pendency of the Proceeding would delay the administration of this case. Although the Debtor, per a July 23, 1997, Order following a status hearing, filed a plan and a disclosure statement on October 1, 1997, the pendency of the Proceeding caused a suspension in the hearing on the disclosure statement until March 4, 1998. Furthermore, the Debtor's failure to obtain a resolution of his status with the Defendants prevented his filing federal income tax returns. The disclosure statement was nevertheless approved on March 4, 1998, and a confirmation hearing is scheduled on April 22, 1998.

Only the Debtor attempted to take pretrial discovery relative to the Proceeding. Disputes regarding the Defendants' production of documents and the identity of their witnesses arose during depositions in California in early January 1998. These disputes intensified as the trial date approached. On February 9, 1998, the Defendants made an informal request to us for a continuance due to

the terminal illness of the father of one of the defense attorneys. When this was denied, principally due to the presence of alternative counsel in the defense firm, an unsuccessful attempt was made to invoke the intervention of Judge Bartle.[1] A series of rancorous letters between counsel regarding potential witnesses and the reports of potential experts then followed. Such last minute disputes are not favored, and we respond only to appropriately filed and served motions. Ultimately, the trial did take place in a lengthy proceeding of February 18, 1998. The Debtor agreed to produce a post-trial submission by February 25, 1998, and we refused to allow the Defendants more than twice as long, *i.e.,* until March 11, 1998, to respond.

The Debtor's witnesses were himself, Wasserman called as of cross-examination, Herzog, and Straus. The Defendants recalled Wasserman, now designated as only a fact witness.

The Debtor testified that he left his home in Darby Township, Delaware County, Pennsylvania, and moved to California when he was sixteen (16) years old to live with his father. Shortly thereafter, he became interested in the recording industry and made the acquaintance of, and moved in with, Lamont Brumfield ("Lamont"). Although he and Lamont were both destitute, indicating a lack of previous successes in this industry by Lamont and Lamont's brother Kenneth (collectively, "the Brumfields") the Debtor signed contracts with the Brumfields in November 1991, giving them exclusive rights over his recording, publishing, and songwriting.

In 1992 the Debtor met Snoop at a party and, through him, met and performed for Andre Young, professional known and herein referred to as "Dr. Dré," and Knight. It was thereafter agreed that the Debtor would perform on Dr. Dré's forthcoming initial album for DRR, ultimately entitled "The Chronic." The Debtor testified that an oral agreement was made that each artist performing on "The Chronic" would share in the revenues therefrom to the extent of their participation on the record. "The Chronic" was released in December 1992 and was extremely successful, selling almost 4 million copies.

Although the Brumfields attempted to negotiate for the Debtor, the Debtor was ultimately presented with a record and a management contract with DRR and SM respectively, which were dated January 1, 1993, by David Kenner, Esquire, an attorney for DRR and SM. There was no negotiation over terms and the Debtor did not consult an attorney before signing them, and he was not given copies of same. His only reference to counsel, made much of by the Defendants, related to subsequent consultation and is irrelevant to the terms of contracting. The Debtor testified that he viewed Knight at that time as his "big home boy," *i.e.,* a trusted friend, and as an astute businessman.

After recording "The Chronic," the Debtor was provided with a fancy apartment, attractive cars, a credit card, and was represented by Kenner in some personal legal matters. However, when he failed to receive any royalty payments, the Debtor began to press Knight for the monies due to him for his performances and writings on several tracks on "The Chronic." Although put off on this request at this time and ultimately forever, the Debtor became involved in other recording enterprises on DRR's behalf. In 1993 he was paid a flat fee for providing a number for the soundtrack of the movie "Poetic Justice," and he teamed with Daz to form "Tha Dogg Pound," a backup group on Snoop's "Doggy Style" album, which, as DRR's most success-

---

1. As far as we can ascertain, the jurisdictional basis for this action was the general statute under which district courts refer matters to bankruptcy courts subject to their power to withdraw their reference of cases, proceedings, and contested matters, 28 U.S.C. § 157(d). However, in this instance there was no filing of either a formal motion to withdraw the reference of the Proceeding or an appeal and accompanying motion for leave to appeal, pursuant to 28 U.S.C. § 158(a)(3), but merely a letter to Judge Bartle.

We advised the Defendants, counsel that this procedure was improper but unfortunately they chose to attempt to utilize it again at another juncture in the Proceeding. *See* page 379 *infra.* In order to clarify our future approach to such actions, we intend to disregard any such further attempts as improper, and will consider imposition of sanctions *sua sponte* under Federal Rule of Bankruptcy Procedure 9011(c)(1)(B) if they are pressed despite our advices.

ful album, sold over 5 million copies. In 1994 he performed on soundtracks for other movies, including "Above the Rim," "Murder Was the Case," and in October 1995, with Daz, released the "Dogg Food" album featuring Daz and him as "Tha Dogg Pound." The "Above the Rim" and "Murder Was the Case" soundtracks and "Dogg Food" each sold in excess of 1.5 million copies.

In 1996 the Debtor performed on two successful DRR albums, "All Eyes on Me," posthumously featuring Tupac Shakur, which sold over 3 .5 million copies, and "The Dogg-father," an album featuring Snoop, which sold over 1.8 million copies. The Debtor also performed on 1996 soundtracks for the movies (or proposed, movies) "Supercop" and "Sunset Park." Finally, he participated on 1996 DRR's "Greatest Hits" and Christmas albums.

The Debtor testified that the "splits," or divisions of royalties on the selections written and preformed by him on albums in which his group was not the featured artist, were discussed in advance by him and other artists and with DRR representative Roy Tesfay. The Debtor indicated no disagreements as to the splits. However, the Debtor became so frustrated with his inability to obtain funds relative to the successes of Snoop, who was managed by Sharitha Knight, Knight's wife ("Sharitha"), that he hired Sharitha as his own manager, in consideration for which she received twenty (20%) percent of his gross income. Although this Contract appears subject to challenge on the basis of a conflict of Sharitha's interests, no such claim or any claim against Sharitha has been raised by the Debtor to date.

The contracts with DRR and SM at interest are quite lengthy and contain numerous provisions which are not in contest. The recording contract, for instance, allowed DRR to recoup its costs from the artist and sets the royalty rate at nine (9%) percent of gross sales. Except for the non-competition clauses, which *Brown II* has already declared unenforceable, the only provisions which appear to be at issue are those relating to splits or joint recordings and to royalty accountings. The pertinent DRR contract clause pertaining to splits reads as follows:

Notwithstanding anything to the contrary contained in Article 9 [relating to payment of Royalties],

10.01. In respect to Joint Recordings, the royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the total number of royalty artists whose Performances are embodied on a Joint Recording.

Both contracts provide essentially as follows regarding royalty accountings: (1) accountings are due semi-annually within 90 days after the end of a reporting period; (2) objections to the accountings are to be made within a specified period (six months in the DRR contract and one year in the SM contract) after the accountings were received; and (3) suit must be brought on any objections raised to the accountings within a specified time (one year in the DRR contract and two years in the SM contract). The record supports the conclusion that the Debtor was completely unaware of any of these provisions when he signed the contracts and engaged in no bargaining regarding these or any other provisions. It is also undisputed that no accountings were provided to the Debtor under either contract at any time.

The SM contract also includes the following provision, in the midst of provisions relating to accountings and restrictions in audits of SM's records and on bringing lawsuits against it:

(b) We will only be required to render accountings and make payment to you with respect to amounts actually received by us or our Administrator in the United States (or credited to our respective accounts in reduction of a previous advance received by us or our Administrator in the United States).

The Debtor called Herzog and Straus as his expert witnesses during the trial. They are accountants who have been engaged in the record industry for over thirty years and have been partners since 1975. By reference to the terms of the contracts and utilizing not

only information supplied by the Defendants but also royalty statements from industry-wide reporting services, identified as Warner Chappell ("Warner") and Soundscan, Herzog compiled accountings of the royalties due to the Debtor for his recordings and, separately, as a writer or publisher of selections performed. The complications of recording royalties included domestic sales, foreign sales, and estimated record club sales. Straus was assigned the unenviable task of reviewing all DRR's records of charges and advances made to the Debtor reflected in records produced to the Debtor in discovery.

The gross recording royalties, including all of the soundtracks and album selections on which the Debtor reported that he appeared, were calculated by Herzog at $1,599,969.22. From total receipts provided to him by DRR which came to $3,173,014.70, Straus disallowed $2,233,277.30, leaving an allowable balance of $939,787.45. The disallowed receipts included many charges listing other parties' names and a few containing the name of the Debtor where he reported that neither he signed the receipt nor that it was credited to any of his accounts. The net amount due to the Debtor as a recording artist was hence calculated to be $660,181.77.

With respect to his publication royalties, the figure was calculated at $704,980.77. This report is broken down into three categories: (1) royalties reportedly sent to SM's Administrator, totalling $273,564.76; (2) royalties due to the Debtor which were not reported to Warner of $353,883.77; and (3) claimed compositions not reported as such on the Warner royalty statements, totalling $77,531.54.

Wasserman also presented accountings during his testimony. As best we can ascertain, he concludes that DRR is owed $1,791,706 in unrecouped costs advanced to the Debtor. Since Wasserman's compilations contain no backup data or explanations which compare in clarity with these presented by Herzog and Straus, it is very difficult to make comparisons between the two. However, the following differences between the two presentations are obvious. First, Wasserman appears to be only crediting the Debtor with recording royalties and not publishing royalties. Second, Wasserman only computes royalties as due for Tha Dogg Pound's own "Dogg Food" album. The royalties from this album are calculated to be $641,959, which incidentally is a higher figure than that appearing in the Herzog/Straus compilations for this album (approximately $500,000). Next, Wasserman deducted advances ($604,171), fees ($11,215), recording cost ($524,049), video cost ($398,230), and producer's royalty payable to Daz ($214,000), plus unaudited Interscope Records advances, recording, video, and production costs ($682,000) from the gross income. The total figure of reductions totals $2,433,665, which we again note is less than the $3,173,014.70 figure of total receipts from which Straus began. However, no disallowances by Wasserman of any charges claimed are noted.

On March 13, 1998, having reviewed the post-trial briefs of the parties, we noted that a substantial portion of the Defendants' legal argument was devoted to arguments that the Debtor failed to supply it with his expert reports prior to trial and that SM was not served until shortly before trial. Therefore, expressly without finding that either of these arguments were meritorious, we noted that we believed that these two procedural problems would be more than adequately cured by providing the Defendants with an opportunity to present further evidence at a supplemental hearing on March 25, 1998. We specifically stated, in an order of March 13, 1998, providing this dispensation that the Defendants could further cross-examine Herzog and Straus and offer any expert evidence in rebuttal to their testimony, and that we would allow SM to offer any additional evidence on any pertinent issue.

Then, on March 16, 1998, we entered a further order inviting the parties to render submissions answering the following questions:

1. Is this proceeding core or non-core? If non-core, do the parties consent to our rendering a final decision or do they insist that this court submit a recommendation of its conclusions to the district court?

2. Does the Debtor's rejection of the contracts at issue affect his rights to recovery against the Defendants?

3. If the contracts at issue are deemed unconscionable, as a whole or in part, does this affect the Debtor's rights to recovery against the Defendants? (Debtor only): Is

**380**

his right to recovery still based strictly on the contracts or upon some other theory?

In response to these orders, beginning on March 18, 1998, the Defendants unleashed a new volley of correspondence, to this court and ultimately again to Judge Bartle,[2] aimed at continuing the supplemental trial until April 27, 1998. These submissions culminated in a formal motion filed on March 23, 1998, which sought to continue the trial because the Debtor and his expert witnesses refused to submit to further discovery. On March 24, 1998, we issued a Memorandum, published at 1998 WL 140889, denying this motion and explaining that the March 13, 1998, order contemplated neither reopening discovery nor any continuance which would overcompensate the Defendants' alleged reduced opportunity for pre-trial preparation.

Although summoning Herzog and Straus, the Defendants ultimately chose, at the supplemental trial, to call only a rebuttal expert witness, Paul Marshall, Esquire. Marshall testified that, from his 40–year experience in the record industry, he did not find the contracts at issue unusual or unconscionable. With respect to the Debtor's claim for recording royalties on albums other than the "Dogg Food" album in which the Debtor and Daz, as "Tha Dogg Pound," were featured artists, he opined that it would be rare for a virtually unknown artist to receive a share of royalties on an album of a well-known featured performer. Therefore, he believed that the Debtor's claims for royalties based on "splits" lacked merit.

With respect to the Debtor's rights to publishing royalties, Marshall admitted that his points regarding recording royalties would not stand, i.e., an unknown would normally obtain his publishing royalties. However, Marshall suggested that SM should not be liable to the Debtor because SM itself had not been paid by sellers of its recordings on account of its publishing rights.

Faced with the duty of weighing this expert testimony, we conclude that the compilations of Herzog and Straus are infinitely more reliable than those of Wasserman. Wasserman's hesitant delivery on the stand and his submission of incomplete, confused compilations from his own client's admittedly poorly-maintained records, which he was forced to correct on the stand, compared most unfavorably to the clear and cogent presentations of Herzog and Straus, which were based upon far more reliable industry sources than the poorly-kept records of DRR and SM. We also observe that, in light of DRR's financial decline and the Debtor's recent prosperity, it is unlikely that DRR would have refrained from taking the initiative in suing the Debtor if it truly believed that he owed any sums to DRR. Meanwhile, Herzog and Straus completely withstood skillful cross-examination on February 18, and no attempt was made to further cross-examine them on March 25 despite their presence.

The testimony of Marshall was the equal of that of Herzog and Straus in credibility, competence, and clarity. Notably, however, Marshall made no effort to undermine either the reputation, sources, or results obtained by Herzog and Straus. Nor did Marshall offer any support for Wasserman's compilations. From the foregoing, we infer that Marshall concedes that the Herzog/Straus work-product is probably the best available under the circumstances.

Marshall's points regarding the industry practices in compensating unknown side performers was a factor in our deciding to back out the recording royalties claimed by the Debtor for "The Chronic." However, this testimony could not overcome the recording contract provisions and unrebutted testimony that "splits" in post-contractual records were compensable to the Debtor under a specific formula, per the provision quoted at page 378 *supra*. Furthermore, as we note below, by no later than early 1996 Tha Dogg Pound was a renowned recording entity in its own right, selling over 1.5 million copies of its own album. It was not an unknown on any records released thereafter.

Marshall's testimony regarding the publishing royalties was also impressive. It has been an important factor in prompting us to back out all of the publishing royalties due to the Debtor, at least at this time, except for the $273,564.76 which Herzog/Straus reported that SM actually received. However, since Herzog/Straus report that this figure

**2.** *See* page 377 n. 1 *supra.*

was in fact received by SM's Administrator, and Marshall offered no verification for his statements that SM did not receive publishing royalties, we see no basis not to award this figure to the Debtor.

We note that only the Debtor accepted our invitation to submit a March 24 memorandum. We must, however, express our displeasure with the Debtor's further submission of an unsolicited post-supplemental hearing memorandum on March 26, 1998, commenting an Marshall's testimony. *See In re Jungkurth,* 74 B.R. 323, 325–26 (Bankr. E.D.Pa.1987), *aff'd sub nom. Jungkurth v. Eastern Financial Services, Inc.,* 87 B.R. 333 (E.D.Pa.1988).

## C. DISCUSSION

### 1. *This is a Core Proceeding Which We Can and Will Determine.*

Neither party addressed the status of the Proceeding as core or non-core in their respective initial post-trial submissions. However, the matter is placed in issue by the Defendants, denial, in their Answer to the Amended Complaint, that the Proceeding is core and their refusal to consent to our entry of a final order or judgment. If the Proceeding is determined not to be core, we would have been obliged to submit findings of fact and conclusions of law in the form of a recommendation to the district court for the entry of a final order by that court, as opposed to our simply entering a final determinative order. *See* 28 U.S.C. § 157(c)(1).

■ In its brief of March 24, the Debtor appears to argue that, since he is seeking a turnover of financial records and an accounting as opposed to mere damages, the Proceeding becomes core under 28 U.S.C. § 157(b)(2)(E). There is some authority for the principle that a proceeding to collect a simple liquidated pre-petition account may be core. *See In re Lila, Inc.,* 133 B.R. 588, 590 (Bankr.E.D.Pa.1991). However, the instant Proceeding is quite complex and the accounts receivable at issue are certainly not in a liquidated state. Therefore, the Proceeding cannot properly be classified as core under § 157(b)(2)(E). *See Beard v. Braunstein,* 914 F.2d 434, 443–45 (3d Cir.1990); and *In re AIA Industries, Inc.,* 75 B.R. 1013, 1016–19 (Bankr.E.D.Pa.1987).

■ However, we believe that another basis for classification of the Proceeding as core arises from 28 U.S.C. § 157(b)(2)(C), which states that counterclaims by the estate against parties filing claims against the estate are core. We recognize that the Complaint is not designated as raising counterclaims to proofs of claim. However, the Proceeding is nevertheless such an action in substance. *Compare In re Meyertech Corp.,* 831 F.2d 410, 417–18 (3d Cir.1987) (adversary proceeding which was in substance the assertion of a proof of claim is core under 28 U.S.C. § 157(2)(B)).

In two ways, each of the Defendants have filed claims against the Debtor. First and most obviously, they have in fact filed formal proofs of claim against the Debtor in this case. While the proofs of claim were filed after the Proceeding was commenced, this factor merely explains why the Debtor may not have so designated the Proceeding as a counterclaim to proofs of claim at its outset and constitutes a completely knowing, voluntary, and intelligent admission of the Defendants of their claims to bankruptcy court jurisdiction. *See In re Glen Eagle Square, Inc.,* 132 B.R. 106, 111–13 (Bankr.E.D.Pa.), *aff'd,* 132 B.R. 115 (E.D.Pa.1991).

Furthermore, the Defendants informally reiterated their proofs of claim by including Counterclaims seeking monetary damages against the Debtor in the Proceeding in their Answer to the Amended Complaint. *See In re Pocono Springs Co.,* 1997 WL 695617, at *2–*3 (Bankr.E.D.Pa. Nov. 6, 1997); and *In re Lloyd Securities, Inc.,* 156 B.R. 750, 752–55 (Bankr.E.D.Pa.1993). The filings of counterclaims in those cases were found to be, in and of themselves, sufficient to render the proceedings in issue there to be core under § 157(b)(2)(C). Here, where a formal proof of claim has also been filed, the disposition of this issue is much simpler. Thus, finding this matter a core proceeding, we will proceed to determine it.

### 2. *The Debtor's Rejection of the Contracts at Issue Does Not Affect His Claims in this Proceeding.*

■ Although it is not clear that the Defendants have presented the issue, we felt it

necessary to satisfy ourselves that our allowance of the Debtor's rejection of the contracts at issue, *see Brown I,* 211 B.R. at 188, did not adversely affect the Debtor's right to prosecute his claims in this action, which are, for the most part, based upon his rights arising under the rejected contracts.

■ Actually, we need look no further than the four corners of *Brown I* to ascertain that the Debtor's rejection of the contracts merely negates the assumption and the Defendants, assertion of future administrative claims on the basis of the contracts, and does not invalidate, repudiate, negate, or avoid these contracts. *Id.* at 190. The *Brown II* reversal does not appear to contradict these principles. *See* 1997 WL 786994, at \*2.

The Debtor, in its Memorandum addressing this issue, appropriately quoted *In re Taylor,* 913 F.2d 102, 106 (3d Cir.1990); and *In re Tomer,* 128 B.R. 746, 756 (Bankr. S.D.Ill.1991), *aff'd,* 147 B.R. 461 (S.D.Ill. 1992), for the principle that a debtor's rejection of a contract does not cut off the right of that debtor's estate to pursue a claim based on an alleged pre-petition breach of that contract. *Accord, In re Flagstaff Realty Associates,* 60 F.3d 1031, 1034 (3d Cir.1995); *In re Printronics, Inc.,* 189 B.R. 995, 1000–02 (Bankr.N.D.Fla.1995); and *In re South Motor Co. of Dade County,* 161 B.R. 532, 545–47 (Bankr.S.D.Fla.1993).

Therefore, the Debtor's rejection of the contracts at issue has no affect on his right to maintain this action for damages based upon alleged pre-petition breaches of those contracts.

3. *Since All Ambiguities in the Contracts Must Be Construed Against the Defendants, and It Would Be Unconscionable to Interpret the Contracts to So Provide, the Debtor's Claims Are Not Barred As Untimely or Premature on the Basis of Procedural Contractual Provisions Because the Defendants Never Provided the Accountings Necessary to Trigger the Procedures Established.*

■ The starting point for our analysis of the instant contracts is the familiar concept that, since these contracts were forms prepared by the Defendants or their counsel and presented to the Debtor on a take-it-or-leave-it basis, they are adhesion contracts which must·be construed, in any provision in which they are ambiguous, against the Defendants as their draftspersons. *See* Cal.Civil Code, § 1654; *Victoria v. Superior Court,* 40 Cal.3d 734, 739, 710 P.2d 833, 222 Cal.Rptr. 1 (1985); and *Federal Nat'l Mortgage Ass'n v. Bugna,* 57 Cal.App.4th 529, 535, 67 Cal. Rptr.2d 233, 236 (1997). *Cf. In re Orsa Associates, Inc.,* 106 B.R. 418, 425 (Bankr. E.D.Pa.1989); and *In re Temp–Way Corp.,* 82 B.R. 747, 751 (Bankr.E.D.Pa.1988).

We note that this concept is distinct from the issue of unconscionability, which the parties have discussed at some length, and which we also deem alternatively applicable. *See* page 383 *infra.* In a claim of unconscionability, a party attempts to prevent the enforcement, against that party, of an unambiguous contract obligation on the ground that it would be unfair to do so. In the following analysis, the issue is whether the contract actually creates the obligation in the first place is at issue.

■ The Debtor's rights to recoveries under both contracts are initially triggered by the obligations of DRR and SM to periodically provide accountings of royalties due to the Debtor. The Defendants admittedly never provided any such accountings to the Debtor at any time. Consequently, the Debtor had no opportunity to object to the accountings, had no statements on which to base notices to cure, and had no bases on which to commence the type of actions disputing accountings which are described in the contracts. In light of the presence of such fundamental initial overriding deficiencies, the Debtor cannot be faulted for not adhering to these contractual provisions. Since the Debtor's inability to perform any such obligations was due only to the Defendants' breaches of their own obligations, the Debtors' alleged breaches cannot be used against him. *See United States for Use of T.M. Page Corp. v. Hensler,* 125 F.Supp. 887, 895 (S.D.Cal.1954); *Parsons v. Bristol Development Co.,* 62 Cal.2d 861, 868–69, 402 P.2d 839, 44 Cal.Rptr. 767 (1965); and *San Bernardino Valley Water Develop-*

*ment Co. v. San Bernardino Valley Municipal Water District,* 236 Cal.App.2d 238, 265, 45 Cal.Rptr. 793 (1965).

■ In the alternative that it could be found that the notice provision or the limitation provision were effective as unambiguous contractual obligations, we conclude that the principle of unconscionability would overcome their enforcement against the Debtor in the instant contracts. California law contains a statute, Cal.Civil Code, § 1670.5(a), which provides as follows:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the Court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

The California cases analyze unconscionability as having both a procedural and a substantive element. *See, e.g., Carboni v. Arrospide,* 2 Cal.App.4th 76, 82–83, 2 Cal. Rptr.2d 845, 848–49 (1991); and *A & M Produce Co. v. FMC Corp.,* 135 Cal.App.3d 473, 486, 186 Cal.Rptr. 114, 121–22 (1982). The procedural element relates to the factors of "oppression," referring to an inequality of bargaining power, absence of negotiation, and an absence of a meaningful choice; and "surprise," which relates to the obscurity of a provision in the context of a lengthy document. *Id.* The "substantive" element references the harshness of the provision in light of the circumstances present at the time that the contract was made. *Id.*

We have little difficulty finding that enforcement of the limitation and notice provisions against the Debtor in the instant circumstances would be unconscionable under this analysis. Despite the Defendants' attempt to characterize the Debtor as a knowledgeable contracting party, we find him quite the opposite. He was very young, quite inexperienced, and professionally nothing other than a musician, who was not in any respect trained in the law and particularly the intricacies of recording and publishing contracts. The testimony of the Defendants' own expert Marshall regarding the typical lack of bargaining power of fledgling recording artists

with music industry companies supports this conclusion. Contrary to the Defendants' suggestion that the Debtor's previous execution of the Brumfield contracts suggested enlightenment on his part, we find the contrary to be true. Had the Debtor possessed any degree of sophistication in such matters, he would have been unlikely to have signed two inconsistent contracts within a space of a little over a year. *See also Graham v. Scissor–Tail, Inc.,* 28 Cal.3d 807, 821–28, 623 P.2d 165, 171 Cal.Rptr. 604 (1981) (experienced rock promoter permitted to invoke unconscionability to modify the partiality of an arbitration provision placed in a promotion agreement by the performer's union).

The contracts at issue are lengthy and the provisions at issue are not particularly conspicuous. There is no evidence that these particular notice or limitation provisions were the subject of any discussion between the parties, let alone the subject of any negotiations, when the contracts were signed. In fact, there is no indication that these provisions were ever called to the Debtor's attention at any time by Knight, the Debtor's so-called manager Sharitha, Kenner, or anyone else.

The substantive element is satisfied because there was no showing of any particular need on the part of the Defendants to limit the Debtor's rights to recover royalties by imposing a host of complex procedural thresholds at the time of the signing of the contracts. It would constitute an extremely harsh reading of the contracts to limit the Debtor's rights in any future circumstances on the ground of his failure to adhere to these procedural prerequisites, even in the event that the Defendants produced nothing in the way of statements or accountings. The Defendants now apparently ask us to read the contracts in this one-sided fashion. We decline to do so.

  *4. The SM Contract Providing Limiting Publishing Royalties to Amounts Actually Received Causes us to Limit SM's Damages to Only Those Royalties Reported by Herzog/Straus as Actually Received by SM's Administrator.*

■ We approach somewhat differently SM's argument, well-articulated by Marshall

in his testimony, that SM's liability on its publishing contract with the Debtor is excused because SM has not itself received payments. There is indeed an unambiguous provision in the SM contract, quoted at page 378 *supra* which states that SM is only required to render accountings and make payments to the Debtor with respect to accounts actually received by SM itself or its Administrator on account of such royalties. There is also nothing substantively unconscionable about such a provision, nor do we understand the Debtor to so contend. Perhaps the best argument which the Debtor could make against strict enforcement of this provision against him would be an invocation of the principle that the Defendants' burden of proving the inability of performance due to an intervening *force majeure* in a contract is demanding and was not met here. *See Butler v. Nepple,* 54 Cal.2d 589, 599, 354 P.2d 239, 244–45, 6 Cal.Rptr. 767, 772–73 (1960); and *Hensler v. City of Los Angeles,* 124 Cal.App.2d 71, 82–83, 268 P.2d 12, 20–21 (1954). The evidence on both sides on the issue of SM's receipt or nonreceipt of publishing royalties is somewhat shadowy. The burden of proof of non-receipt would logically seem to fall on SM in any event, as the party with the best access to proof on this issue. In light of the uncertainties which have emerged, we therefore add some room for adjustment of our tentative result in the event that clearer evidence surfaces.

Wasserman and Marshall both stated, but failed to prove, that publishing royalties were not received by SM. If any burden is placed upon SM to prove this point, it is very doubtful that this burden was carried.

On the other hand, Herzog and Straus hedge to at least some degree on this issue by breaking down the publishing royalties into the categories of those which they are confident were received by SM's Administrator, in the amount of $273,564.26, and other categories which they merely infer should have been received by SM, constituting the balance of $431,415.31.

We are very reluctant to award sums to the Debtor to which he might not yet be due under the clear terms of the SM contract. We will therefore proceed to enter judgment in favor of the Debtor as to only the $273,-564.76 sum in which the clear preponderance of the evidence is in his favor. As to the balance, we deem it unfair to enter any judgment against SM at this time. On the other hand, we consider it equally unfair to foreclose the Debtor from ever recovering any additional sums from SM under this contract. In order to add a measure of symmetry, we will indicate, in our order, that the $273,-546.73 award is entered without prejudice to other parties to increase or decrease this amount in further litigation in this or any other court.

5. *The Debtor Is Entitled to Receive Compensation for Most of the "Splits" on Recordings Covered by The DRR Contract, Although We Further Find That His Pre-Contract Services on "The Chronic" and His Services on Soundtracks Must Be Excluded.*

■ The clause in the Debtor's contract with DRR relating to "Joint Recordings," quoted at page 378 *supra,* appears to provide that the Debtor is to be paid royalties on Splits. It is unclear to what circumstances other than split recordings this provision could apply. Again, if there is any ambiguity lurking in this provision, it must be interpreted in favor of the Debtor and against the Defendants.

Nevertheless, we appreciate the wisdom of Marshall's testimony that, in the absence of a contractual provision, an unknown artist performing on the recording of a famous artist cannot expect to receive a proportionate share of the recording royalties because it is the name of the famous artist which "sells" the record.

For this reason, we have determined that the Debtor is not entitled to splits on the "The Chronic" album of Dr. Dré. The Debtor's contract with DRR including his right to split royalties was not executed until after the recording of "The Chronic." Despite Herzog's testimony that the timing of execution of such contracts is insignificant, and the Debtor's testimony that all of the artists agreed that splits would be calculated on that particular album, we believe that the presence of a written contract on this point is the

determinative factor. In the absence of a valid contract applicable to "The Chronic," we are not inclined to allow the Debtor to receive royalties in connection with this recording.

We also note that the Debtor was truly an unknown when he performed on "The Chronic." It was the first DRR album and the first album of any kind on which the Debtor performed. Marshall's testimony therefore makes the most sense when it is applied to the Debtor's performances on this album.

We further note, however, by reference to the Debtor's recording history related at pages 377–78 *supra*, that, by the time that "Doggy Style" was released, the DRR contract, which appears to us to expressly authorize the splits, was firmly in place. Moreover, by that time, Snoop had emerged from Dr. Dré's shadow as an artist in his own right and Tha Dogg Pound appears to have become a beneficiary of this development because of its close association with Snoop. The next DRR release, after three soundtracks, which we hold, at page 385 *infra*, will be excluded from our calculations, was Tha Dogg Pound's own record, "Dogg Food," on that record, the Debtor and Daz emerged from Snoop's shadow as artists in their own rights. Although no further Dogg Pound releases *per se* followed, once the Debtor had so emerged, we believe it is safe to assume that Marshall's characterization of the Debtor as an unknown or virtually unknown artist no longer applied. There is every reason to assume that the Debtor received at least some "star" recognition in the sales of the subsequent Tupac "All Eyes on Me" album and Snoop's Doggfather album on which he appeared.

We therefore conclude that the Debtor is entitled to most, if not all, of the splits calculated into his recording royalty accountings by Herzog and Straus. As we note in the following discussion, we will back out the royalties attributed to "The Chronic" from these accountings.

In addition to exclusion of the royalties from "The Chronic," we believe that we must also deduct, from the Herzog/Straus calculations, certain other royalties. With respect to the "Poetic Justice" and "Above the Rim"

soundtracks, the Debtor expressly testified that he was paid a flat fee for recording certain songs. We understand these payments to represent compensation in lieu of recording royalties, which must be backed out of the Herzog/Straus calculations.

There was no express testimony in the record regarding the arrangements for payments of royalties on the other soundtracks on which the Debtor performed, namely "Natural Born Killers," "Murder Was the Case," "Sunset Park," "Hemp museum," or "Supercop." However, we can conceive of no basis why the arrangements for compensation of the Debtor on these soundtrack albums should be different from those described in the cases of "Poetic Justice" and "Above the Rim." Furthermore, we note that all of the soundtrack albums except "Murder Was the Case" were, like "Poetic Justice," not released on DRR. We also note that none of these records, with the exception of "Murder Was the Case," were very successful relative to the Dr. Dré, Snoop, Dogg Pound, and Tupac albums. Since we believe that it is likely that royalties were not collectible on any of these recordings, we will back the Herzog/Straus calculated recording royalties out of these as well.

6. *Remaining Issues: Computation of Damages.*

A few legal issues remain which deserve some brief attention. Then, we will attempt to set forth our precise method of calculating the damages, recognizing that, with respect to the mathematical calculations necessary to compute the sum due on the DRR contract, errors could easily have been made. In addition to expressly holding open the final decision regarding the sums due under the SM contract, we invite either party to file timely motions to reconsider any calculations or assumptions in connection with that calculation which they believe to be in error.

In making the foregoing statement, we candidly admit that the evidence in the record is not seamless and the precise calculations are subject to question. However, the Herzog/Straus submissions appear quite sufficient to allow us to establish damages with

the requisite degree of "reasonable certainty." *See In re Chapman*, 77 B.R. 1, 6 (Bankr.E.D.Pa.1987). *Compare In re Pennsylvania Footwear Corp.*, 204 B.R. 165, 178–83 (Bankr.E.D.Pa.1997).

In rendering our decision, we expressly decline the Debtor's request that we characterize the Defendants' contractual breaches as violations of the automatic stay, subject to 11 U.S.C. § 362(h). *See In re Orsa Associates, Inc.*, 99 B.R. 609, 622–23 (Bankr. E.D.Pa.1989); and *In re TM Carlton House Partners, Ltd.*, 93 B.R. 859, 870 (Bankr. E.D.Pa.1988)., The Debtor's proper recourse is to institute suit in this or a nonbankruptcy court of competent jurisdiction seeking redress, which the Debtor has done in the Proceeding.

We also perceive no basis to rely on an alleged fiduciary relationship between Knight and any other party on one hand and the Debtor on the other. We fail to find any extraordinary over-reaching on the part of Knight which went beyond the normal business relationship of contracting parties, which is not ordinarily considered to be a fiduciary relationship. *See Trumpet Vine Investments, N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1117 (11th Cir.1996); *SBK Catalogue Partnership v. Orion Pictures Corp.*, 723 F.Supp. 1053, 1069–72 (D.N.J.1989); and *Mellencamp v. Riva Music, Ltd.*, 698 F.Supp. 1154, 1156–60 (S.D.N.Y.1988); *Gonsalves v. Hodgson*, 38 Cal.2d 91, 98, 237 P.2d 656, 661 (1951); and *Recorded Picture Co. [Productions] Ltd. v. Nelson Entertainment, Inc.*, 53 Cal.App.4th 350, 370, 61 Cal.Rptr.2d 742, 754 (1997).

Finally, we are disinclined to rely on any theories that the Debtor is entitled to compensation on the basis of restitution or quantum meruit, as the Debtor suggests as alternatives to his contract-based theories in his March 24 memorandum. No such grounds appear to have been pleaded. At the very least, a motion to amend the pleadings and an opportunity to opposing parties to respond thereto must precede such a belated change of legal theory. *See Pennsylvania Footwear, supra*, 204 B.R. at 177–78. Since no such motion has been made, these theories will not be considered.

The measurement of the damages due under the publishing contract is elementary. We choose to accept, at least at this juncture, the $273,564.76 figure which Herzog/Straus claimed was actually paid to SM on account of the Debtor's publications.

The calculation of the recording royalties is more complex. The sums which we will back out of the Herzog/Straus calculations are reflected on the following chart:

| Recording | Domestic | Foreign | Club | Total |
|---|---|---|---|---|
| The Chronic | $112,231.37 | $469.91 | $23,223.58 | $135,924.86 |
| Above the Rim | 21,852.92 | 172.94 | 1,769.25 | 23,795.11 |
| Sunset Park | 15,407.33 | 33.42 | 588.14 | 16,028.89 |
| Natural Born Killers | 11,330.10 | 2.53 | 3,052.49 | 14,385.12 |
| Hemp Museum | 3,207.72 | | | 3,207.72 |
| Supercop | 337.22 | | 50.59 | 387.81 |
| Poetic Justice | 9,969.31 | | | 9,969.31 |
| Murder Was the Case | 129,053.82 | 364.23 | 7,363.16 | 136,781.21 |
| | | | | $340,480.03 |

The deduction of $340,480.03 in recording royalties reduces the Debtor's royalty entitlement from $660,181.77 to $319,701.74. We will award him judgment on the DRR contract in that amount only.

## D. CONCLUSION

An order consistent with the conclusions explained in this Opinion will be entered.

## ORDER

AND NOW, this 2nd day of April, 1998, after a trial of the above-captioned proceeding of February 18, 1998, as supplemented on March 25, 1998, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of RICHARDO E. BROWN, JR. p/k/a KURUPT ("the Debtor") and against Defendant DEATH ROW RECORDS, INC. ("DRR") in the amount of $319,701.74.

2. Judgment is entered in favor of the Debtor and against Defendant SUGE MUSIC in the amount of $273,564.76. This aspect of the judgment is without prejudice of either party to adjust this figure in this proceeding or in other litigation in this court or another court of competent jurisdiction on the basis of evidence not submitted to this court.

3. Judgment is entered in favor of INTERSCOPE RECORDS and against the Debtor, as the Debtor did not pursue any claims against this party.

## ORDER / MEMORANDUM

AND NOW, this 28th day of April, 1998, upon consideration of the Motion of Death Row Records, Inc. ["DRR"] and Suge Music ["SM;" with DRR, "the Defendants"] for Reconsideration of Opinion and Order Dated April 2, 1998 ["the Opinion"], and Amendment of Findings and Judgments, and Including Expedited Request for Stay of Enforcement of Judgment Pending Disposition Hereof ("the Motion"), and the timely response of the Plaintiff–Debtor ("the Debtor") thereto, it is hereby

ORDERED AND DECREED that the Motion is DENIED in its entirety and that the Opinion to which it relates, now reported as 1998 WL 154649, shall stand as entered.

In apparent response to our invitation to the parties in the Opinion, at 379, to file timely motions requesting reconsideration of any calculations or assumptions in connection therewith which they claimed were erroneous, we have received only the Motion of the Defendants, which argues but two points, neither of which appears to us to have merit.

First, with respect to the Debtor's claims against SM, that Defendant argues that (1) this court should reduce the $273,564.76 award against it by one-half, or to $136,784.38, in light of ¶ 4(b) of the parties' contract, entitling the Debtor to only one-half of the net income on publishing royalties; and (2) the award represents the Debtor's gross income from his publishing works, from which some portion (estimated by the Defendants without any apparent basis at thirty (30%) percent of the $136,784.38 figure) of the total allowed expenses of $939,787.45, see Opinion, at 376, should be deducted to ascertain the appropriate net amount due.

However, we agree with the Debtor's responses that (1) the fifty (50%) percent allowance was already calculated into the figures calculated by the Debtor's experts Herzog and Straus on which we relied; and (2) no evidence of any costs attributable to publishing royalties was proven or even suggested by SM, and intuitively there is no reason to assume that any significant expenses would be imposed in connection with such royalties, e.g., possibly filing copyrights or other administrative costs, the accomplishment of which was nowhere asserted in the record.

We also note that, if we took a portion of the $939,787.45 total costs and allocated same to the publishing royalties, we would be obliged to decrease the costs, all of which were allocated to recording royalties, from our calculation of the recording royalties in that same amount, thus increasing the Debtor's net recording royalties due from DRR. If indeed such costs should be so allocated as partially attributable to SM as opposed to their all being attributed to DRR, those two related Defendants would appear capable of making this adjustment internally rather than requiring us to decrease the judgment against SM and increase the judgment against DRR in the same amount.

Second, with respect to the Debtor's claims against DRR, DRR argues that ¶ 10 of the contract, pertaining to joint recordings, was intended only to limit DRR's recording royalties and not to provide the Debtor with a right to royalties from recordings split with other artists, or "splits," per the Opinion at 378–79. We disagree that there was no evi-

dence on this issue other than the contracts; the Debtor provided unrebutted testimony, consistent with his assertions all along and hence well known to DRR if their witnesses could rebut same, that all of DRR's artists and DRR's representatives agreed to the splits. Opinion at 375–76. We also disagree that our analysis was inconsistent with the testimony of DRR's expert Marshall. *See id.,* at 378.

Furthermore, DRR can point to no specific provision in its self-drafted, potentially unconscionable adhesion contract, *see id.,* at 378, which supports its reading. There is no question that ¶ 9 of the DRR contract addresses the calculation of royalties. The next paragraph (¶ 10) explains the royalty calculations in the foregoing paragraph as to "joint recordings." Nothing in that paragraph suggests that it is meant strictly as a limitation on DRR's liability, although DRR clearly could have put language into it which would have so provided. We continue to decline to so read it in the face of the Debtor's unrebutted testimony regarding the agreement of all interested parties that the Debtor was entitled to a percentage of the royalties on other artists' albums, or splits, pursuant to the Debtor's contract with DRR.

Since none of the Defendants' claims have merit, the Motion must be and hereby is denied in its entirety.